979 F.2d 728
 61 USLW 2332, 1992-2 Trade Cases P 70,037
 George AUSTIN, M.D., Plaintiff-Appellant,
v.
James V. McNAMARA, M.D.; James R. St. John, M.D.; Richard
B. Brown, M.D.; Paul J. Schweinfurth, M.D.;
Thomas Jones, M.D.; Santa Barbara
Cottage Hospital, Defendants-Appellees.
 No. 90-55333.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 6, 1991.
Decided Nov. 6, 1992.
 
 Thomas Kallay, Santa Monica, Cal., David M. Harney, Harney, Drummond, Garza & Packer, Los Angeles, Cal., for plaintiff-appellant.
 Ellis J. Horvitz, Sandra J. Smith, Horvitz & Levy, Encino, Cal., Jeffrey C. Moffat, Bonne, Jones, Bridges, Mueller & O'Keefe, Los Angeles, Cal., James P. Herzog, David R. Fisher, Herzog & Fisher, Marina del Rey, Cal., Jeanette M. Nelson, Bauer, Harris & McEvoy, Santa Barbara, Cal., John J. Weber, O'Flaherty & Belgum, Long Beach, Cal., Keith N. Crouch, George McDonald & Associates, South Pasadena, Cal., Randall L. Shelley, Rushfeldt, Shelley & Drake, Sherman Oaks, Cal., for defendants-appellees.
 Astrid G. Meghrigian, San Francisco, Cal., Lawrence Silver, Los Angeles, Cal., Stephen D. Libowsky, Katten, Muchin & Zavis, Chicago, Ill., for amici curiae.
 Appeal from the United States District Court for the Central District of California.
 Before PREGERSON, CANBY and RYMER, Circuit Judges.
 CANBY, Circuit Judge:
 
 
 1
 This is an appeal by plaintiff Dr. George Austin of a grant of summary judgment for the defendants, a hospital and doctors affiliated with it, in a case alleging Sherman Act and pendent state law violations. The district court held that the defendants were immune from antitrust liability under the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. §§ 11101-11152 (1988), which took effect while the events giving rise to this lawsuit were unfolding. The district court accordingly granted summary judgment for the defendants on Austin's antitrust claims and dismissed the pendent state law claims. Austin appeals that ruling, arguing principally that his claims matured before the immunity provision of HCQIA took effect. We now affirm.
 
 FACTUAL BACKGROUND
 
 2
 Dr. Austin, a neurosurgeon, moved to Santa Barbara in 1981. He applied for and received staff privileges at several hospitals in the area, including the Santa Barbara Cottage Hospital ("Cottage Hospital"). At the time of his arrival, there were three other neurosurgeons in the area, all of whom also had privileges at Cottage Hospital: Drs. Brown, St. John and Schweinfurth. A fifth neurosurgeon, Dr. Jones, moved to Santa Barbara and became a member of the Cottage Hospital staff a few months after Austin's arrival.
 
 
 3
 According to Austin, in the years between his arrival and the suspension of his privileges at Cottage Hospital in 1986, Drs. Jones and St. John openly attacked him in front of nurses on the staff of Cottage Hospital, and all the other neurosurgeons attacked his judgments in monthly meetings of the neurosurgical group. In addition, Drs. St. John and Brown categorically refused to "cover" for him (substitute for him when he was busy or unavailable), and the other doctors frequently refused to cover for him.
 
 
 4
 In January 1986, Dr. McNamara became chief of staff at Cottage Hospital and Dr. Brown became chief of surgery. Shortly thereafter, Dr. McNamara informed Austin that an internal evaluation of his cases would take place, in the form of a review by Dr. Brown of Austin's cases from 1985. This evaluation was apparently in response to complaints received from the nursing and technician staffs, as well as from Austin's colleagues.
 
 
 5
 Dr. Brown subsequently presented his findings to the Surgical Audit Committee ("SAC"), on which Dr. Schweinfurth sat. Dr. Brown identified alleged deficiencies in 26 of Austin's 30 cases from 1985, as well as three "problematic" cases from 1986. The SAC voted to have an outside reviewer further evaluate Austin's charts and suggested that the hospital continue to monitor his work.
 
 
 6
 In June 1986, Dr. McNamara requested Cottage Hospital's Medical Executive Committee ("MEC") to establish an ad hoc committee to investigate concerns about Austin's treatment of patients. The ad hoc committee, on which Dr. Jones served, met four times that summer to discuss possible revocation of Austin's staff privileges. During this same period, Dr. McNamara arranged for an external review by two outside neurosurgeons who were appointed by the California Medical Association. The reviewers gave a generally favorable evaluation of Austin but expressed reservations and recommended further monitoring.
 
 
 7
 In August 1986, the ad hoc committee voted to request the SAC to monitor Austin's work for six months but did not take any action to limit his clinical privileges. Drs. Brown, Jones and St. John were among those who reviewed Austin's cases as part of the monitoring process.
 
 
 8
 On November 17, 1986, three days after the immunity provision of HCQIA became effective, Dr. McNamara, as chief of staff, informed Austin that his staff privileges at Cottage Hospital were summarily suspended. This action was apparently taken by Dr. McNamara after he had presented to the MEC certain of Austin's cases that the other neurosurgeons had found to indicate substandard treatment. Two days later, on November 19, Austin appeared before the MEC to defend his treatment in the cases in question. At that meeting, the MEC recommended that Austin's privileges be revoked.
 
 
 9
 Austin's suspension from Cottage Hospital lasted approximately seven months. During that time, Austin continued to enjoy staff privileges at other hospitals in the area and was able to see patients and perform surgery at one of these hospitals.
 
 
 10
 Austin requested and received a hearing before the Judicial Review Committee ("JRC"), which was composed of impartial doctors and a former California appellate judge, to appeal the revocation of his staff privileges. After lengthy hearings, the JRC issued a report finding that the MEC's decision to suspend Austin was "unreasonable" and reinstated Austin to the Cottage Hospital medical staff. The report also found, however, that Austin's treatment of one patient had been substandard, and it recommended that Austin's privileges be reinstated subject to "Internal Medicine, Pathology and Radiology procedural consultations" and "periodical outside independent neurosurgical case review." Austin did not appeal the JRC's findings and did not name either the JRC or its members as defendants in this suit.
 
 
 11
 After his reinstatement, Austin brought this action against Cottage Hospital and Drs. Brown, Jones, McNamara, St. John and Schweinfurth. He asserted claims against all defendants for antitrust violations under the Sherman Act, 15 U.S.C. §§ 1 and 2 (1988);[1] civil rights violations under 42 U.S.C. § 1983 (1988); and pendent state law claims of conspiracy and intentional interference with prospective economic advantage.
 
 
 12
 The district court dismissed the civil rights claim, which ruling Austin does not appeal. The district court then granted summary judgment in favor of all the defendants on the antitrust claims and dismissed the pendent state law claims without prejudice. The basis for the grant of summary judgment was that the defendants were immune under HCQIA. Austin now appeals the district court's ruling on the antitrust claims.[2]DISCUSSION
 
 I. Immunity from Damages under HCQIA
 
 13
 HCQIA was designed both to provide for effective peer review and interstate monitoring of incompetent physicians and to grant qualified immunity from damages for those who participate in peer review activities. See 42 U.S.C. § 11101. In furtherance of the latter goal, HCQIA provides that, if a "professional review action" (as defined in HCQIA) meets certain due process and fairness requirements, then those participating in such review "shall not be liable in damages under any law of the United States or of any State (or political subdivision) with respect to the action." 42 U.S.C. § 11111. This section excludes from its coverage suits brought under 42 U.S.C. § 1983 or Title VII of the Civil Rights Act of 1964, but it clearly does apply to antitrust claims. See Patrick v. Burget, 486 U.S. 94, 105 n. 8, 108 S.Ct. 1658, 1665 n. 8, 100 L.Ed.2d 83 (1988). Because Austin seeks only damages, he can maintain this action only with respect to those acts that are not entitled to immunity under HCQIA.[3]
 
 
 14
 The defendants are immune from antitrust damages under HCQIA if they have demonstrated, first, that their professional review actions complied with the fairness standards set out in 42 U.S.C. § 11112(a); second, that they satisfied § 11112(b)'s requirement of adequate notice and hearing; third, that the hospital reported the results of the professional review action to the state authorities in compliance with §§ 11131-34; and fourth, that the professional review actions commenced on or after November 14, 1986, the effective date of HCQIA.
 
 
 15
 Austin does not challenge the defendants' compliance with the reporting or notice and hearing requirements, but he does contend that the professional review actions did not meet the standards set out in § 11112(a) and that they commenced before the effective date of the act.
 
 
 16
 A. Did the "Professional Review Actions" Meet the Standards Propounded in 42 U.S.C. § 11112(a)?
 
 Section 11112(a) provides that:
 
 17
 For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken--
 
 
 18
 (1) in the reasonable belief that the action was in furtherance of quality health care,
 
 
 19
 (2) after a reasonable effort to obtain the facts of the matter,
 
 
 20
 (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
 
 
 21
 (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
 
 
 22
 A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.
 
 
 23
 Austin argues that the defendants' actions did not comport with paragraphs 1, 2, and 4 of the preceding section, and that, therefore, the district court erred in holding that HCQIA rendered the defendants' immune.
 
 
 24
 1. Standard of Review of Austin's Argument Arising Out of § 11112(a)
 
 
 25
 We review the grant of summary judgment de novo and should reverse if a reasonable jury, viewing the facts in the light most favorable to the nonmoving party, might return a verdict in that party's favor. T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 631 (9th Cir.1987). In this case, the rebuttable presumption of § 11112(a) creates a somewhat unusual standard: Might a reasonable jury, viewing the facts in the best light for Austin, conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)? See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.").
 
 
 26
 The legislative history of § 11112(a) indicates that its reasonableness requirements were intended to create an objective standard, rather than a subjective good faith standard. The House Report on § 11112(a) stated:
 
 
 27
 Initially, the Committee considered a "good faith" standard for professional review actions. In response to concerns that "good faith" might be misinterpreted as requiring only a test of the subjective state of mind of the physicians conducting the professional review action, the Committee changed to a more objective "reasonable belief" standard. The Committee intends that this test will be satisfied if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients.
 
 
 28
 H.R.Rep. No. 903, 99th Cong., 2d Sess. 10, reprinted in 1986 Code Cong. & Admin.News 6287, 6392-93 (emphasis added). Thus, our inquiry focuses on whether Austin has provided sufficient evidence to permit a jury to find that he has overcome, by a preponderance of the evidence, the presumption that physicians in the defendants' position would reasonably have believed that their action was warranted by the facts.
 
 
 29
 2. Are Austin's Allegations Sufficient to Avoid Summary Judgment?
 
 
 30
 Austin presents two bases for his argument that summary judgment was improperly granted: first, the other neurosurgeons were hostile to him and treated him with contempt;[4] and second, the JRC found that his suspension was unreasonable.
 
 
 31
 With regard to the alleged animosity, Austin's assertions of hostility do not support his position because they are irrelevant to the reasonableness standards of § 11112(a). The test is an objective one, so bad faith is immaterial. The real issue is the sufficiency of the basis for the defendants' actions.[5]
 
 
 32
 The JRC's findings, in contrast, are relevant to the reasonableness standards, in that they address both the adequacy of the treatment at issue and the propriety of Austin's suspension. With respect to the JRC report, Austin places considerable emphasis on the JRC's statement that "objective monitoring by the neurosurgeons of Cottage Hospital could not be done" and on its conclusion that "the preponderance of the evidence favors Dr. Austin and ... [that] the recommendation of the Medical Executive Committee was not reasonable and warranted and that the clinical privileges of Dr. Austin should not be revoked." Austin suggests that these statements indicate that the defendants did not satisfy the requirements of § 11112(a) in monitoring and subsequently suspending him.
 
 
 33
 The JRC's statements do call into question the ultimate reasonableness of Austin's suspension. That is a different question of "reasonableness," however, than the issue whether the defendants acted in the "reasonable belief that the [suspension] was warranted by the facts known after reasonable effort to obtain facts" as required by section 11112(a)(4). The JRC report also concluded that Austin's failure to respond to a change in a patient's state of consciousness and his failure to examine that patient were "below the applicable standard."[6] Moreover, the JRC, while overturning the suspension, stated that "the totality of problems reasonably warrants some appropriate conditions on the continued exercise of clinical privileges by Austin," and so imposed conditions on Austin that were, according to the district court, "significant restrictions that are out of the ordinary for a surgeon of Plaintiff's experience." Austin v. McNamara, 731 F.Supp. at 938. In light of the JRC's criticism of Austin and its recommendation that conditions be placed on his practice, no reasonable jury could find that the JRC report is sufficient to establish the nonexistence of the defendants' "reasonable belief" and "reasonable effort." For this reason, we conclude that the JRC report does not rebut the presumption set out in § 11112(a). The district court consequently did not err in finding that the defendants' actions met the requirements of § 11112(a).
 
 
 34
 B. Did Any "Professional Review Actions" Commence Before the Effective Date of HCQIA?
 
 
 35
 Austin's main argument against application of HCQIA is that the defendants' actions commenced before the effective date of the act and therefore are not protected by HCQIA. Section 416 of HCQIA[7] states that HCQIA "shall apply to professional review actions commenced on or after the date of the enactment of this Act," and the date of enactment was November 14, 1986. Pub.L. No. 99-660, 100 Stat. 3788. The parties agree that this section is controlling, and that there is no provision for retroactive application of HCQIA. The crucial question, then, is whether the district court erred in granting summary judgment for the defendants on the ground that the "professional review actions" at issue in this case commenced after November 14, 1986.
 
 
 36
 Section 11151 of HCQIA provides in part that
 
 
 37
 (9) The term "professional review action" means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients) and which affects (or may affect) adversely the clinical privileges, or membership of a professional society, of the physician. Such term includes a formal decision of a professional body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action....
 
 
 38
 (10) The term "professional review activity" means an activity of a health care entity with respect to an individual physician(A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,
 
 
 39
 (B) to determine the scope or conditions of such privileges or membership, or
 
 
 40
 (C) to change or modify such privileges or membership.
 
 
 41
 The district court found that there were two professional review actions with respect to Austin, both of which took place after the effective date of HCQIA: the revocation of Austin's privileges on November 19 and the subsequent JRC proceeding.[8] Austin challenges the district court's reading of HCQIA. He argues that some of the defendants' pre-November 14 acts constituted professional review actions or professional review activities that qualify as the beginning of professional review actions. The result, he argues, is that the entire revocation process was commenced before the effective date of HCQIA and, therefore, the defendants are not entitled to any immunity under HCQIA. The defendants, in contrast, contend that their pre-November 14 acts did not constitute professional review actions (and so did not trigger the exclusion from HCQIA). The defendants also argue that their pre-November 14 acts are entitled to immunity under HCQIA because they are professional review activities that occurred in the context of subsequent--and immune--professional review actions. Thus, Austin's interpretation of HCQIA is that none of the defendants' acts are covered by HCQIA's immunity, while the defendants suggest that all of their acts are covered.[9]
 
 
 42
 The issue is not free from doubt, but we conclude that the defendants' interpretation is better supported by both the language and the purpose of HCQIA. As a consequence, we hold that all of defendants' peer review activities and actions relating to Austin in this case are within the immunity.
 
 
 43
 Our conclusion depends upon the separation of two issues for purposes of analysis: first, the question of when an "action" is "commenced" for purposes of the effective date of the immunity and, second, the question of what activities related to the action are brought within the scope of the immunity.
 
 
 44
 To determine whether an "action" was commenced in this case on or before November 14, 1986, we first look to HCQIA's definition of "action." A professional review action is an action or recommendation "taken or made in the conduct of professional review activity ... which affects (or may affect) adversely the clinical privileges, or membership of a professional society, of the physician." 42 U.S.C. § 11151(9). That language strongly suggests that no "action" was taken in this case until at least November 17, 1986--the first occasion when Austin's clinical privileges were adversely affected. Prior to that time, he had been monitored and reviewed, but no professional review body had limited his clinical privileges or adopted a recommendation that they be limited.
 
 
 45
 Austin points out, however, that "professional review activities" had clearly been initiated before November 14, 1986. He then invokes the next clause in § 11151(9): "Such term [professional review action] ... includes professional review activities relating to a professional review action...." If a professional review action includes professional review activities, Austin contends, then the action must commence when the review activities commence. Although this argument is not without semantic appeal, it fails ultimately to convince us.
 
 
 46
 An "action" is "taken ... in the conduct of professional review activity." 42 U.S.C. § 11151(9) (emphasis added). It must be taken "after a reasonable effort to obtain the facts of the matter." Id. at § 11112(a)(2). That reasonable effort, when expended for the purpose of determining a change in a physician's clinical privileges, constitutes "professional review activity." Id. at § 11151(10)(C). These formulations seem clearly to indicate that an "action" may take place--may begin and end--during "professional review activity." In fact, the action itself can only be taken after professional review activity to determine the facts. We give these provisions a natural reading in concluding that the responsible body "commences" an action when it begins to "take" an action--after it reviews the results of the required investigation. In this case, it commenced the action no earlier than November 17, 1986[10]--three days after the effective date of the immunity provision.
 
 
 47
 In contrast to these provisions, the clause of § 11151(9) urged by Austin--that professional review action "includes professional review activities relating to a professional review action"--does little to indicate when an action is "taken" or when it is commenced. In our view, it is not sufficient to counter the other provisions of HCQIA discussed above.
 
 
 48
 There is also a practical consideration supporting our conclusion that a professional review action is not deemed to commence at the beginning of the investigation upon which it is based. As this case indicates, physicians who become subject to suspension or restriction of privileges may have been monitored or investigated for years. To deny immunity for actions, such as Austin's suspension and revocation, that commenced after November 14, 1986, simply because investigations had taken place before November 14, 1986, would frustrate Congress's intent to put an effective immunity in place. The purpose as well as the language of HCQIA therefore militates in favor of our decision holding defendants immune for their professional review actions in this case.
 
 
 49
 With regard to the scope of the immunity, the clause urged by Austin is of much greater import. A manifest purpose of encompassing professional review activities within the definition of "professional review action" was to grant immunity to reviewing physicians for a wide range of acts, including not only suspensions but also investigations. We have already concluded that the professional review actions taken by the defendants were within the immunity. Section 11151(9) then sweeps within that immunity the investigations "relating to" those professional review actions. The professional review activities, while not qualifying on their own as professional review actions, are nevertheless a component (an inclusion) of those actions for purposes of immunity. Under § 11151(9), it is the relation of these activities to the immune action, and not the time of their occurrence, that brings them within the immunity.
 
 
 50
 Any retroactivity that this construction imports into HCQIA immunity is inherent in the scheme of the statute. The prime injury caused by an investigation for the purpose of modifying a physician's privileges, see § 11151(10)(C), lies in the "action" taken in light of that investigation. If the action is immune, there is but little retroactivity in rendering the investigation immune with it. That, at least, appears to us to be the import of Congress's inclusion of professional review activities as a component of professional review actions.
 
 
 51
 We conclude, therefore, that the professional review actions suspending Austin's privileges, which were taken by defendants after November 14, 1986, were within the immunity conferred by § 11111(a). Defendants' professional review activities relating to those actions, even though conducted in whole or part prior to November 14, 1986, are also covered by that immunity.II. Austin's Antitrust Claims
 
 
 52
 Because the district court held that all of the defendants' acts were immune under HCQIA, it did not reach the question whether Austin's antitrust claims could otherwise survive summary judgment. Austin argues that the district court erred even if, as we have concluded, all of the defendants' peer review activities fall within HCQIA's immunity. Austin points to his allegations and supporting evidence that the defendant physicians refused to "cover" for him, and that they openly attacked him before nurses and in neurosurgical group meetings.
 
 
 53
 It is true, as Austin urges, that the refusals to "cover" and, possibly, the verbal attacks cannot be brought within HCQIA's immunity. Although these acts are rather small remnants of Austin's original antitrust claims, they should have been addressed. We see no need to remand for that purpose, however. Although the district court did not rule on the viability of Austin's claims under antitrust law, that issue was vigorously contested in the moving papers in district court. In addition, both the defendants and Austin discussed this issue in their briefs before this court. The record is, therefore, sufficiently developed to allow us to consider the defendants' motion for summary judgment on what little remains of Austin's antitrust claims. Fidelity Financial Corp. v. Federal Home Loan Bank, 792 F.2d 1432, 1437 (9th Cir.1986) ("We may affirm the district court on a ground not selected by the district judge so long as the record fairly supports such an alternative disposition of the issue.").
 
 
 54
 A. Are Defendants Entitled to Summary Judgment on Austin's Section 1 Claim?
 
 
 55
 Austin's primary antitrust claim is that the defendants' acts constituted a conspiracy in restraint of trade and therefore violated § 1 of the Sherman Act, 15 U.S.C. § 1. The defendants argue that Austin has failed to present evidence that would allow a reasonable jury to conclude that he is entitled to judgment in his favor on this claim.
 
 1. "Rule of Reason" vs. Per Se Rule
 
 56
 At the outset, we must consider Austin's suggestion that the defendants' acts should be analyzed under the per se rule of antitrust liability, rather than the balancing test known as the "rule of reason." We reserve the former approach for those " 'certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal.' " The Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1153 n. 3 (9th Cir.1988) (quoting Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)). The arrangements that can potentially fall into this category are price-fixing agreements, tying arrangements, horizontal divisions of markets, and certain group boycotts. Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1410 (9th Cir.1991).
 
 
 57
 The refusals to "cover" and the alleged public attacks are none of these. Even if we were to conclude that these acts were somehow intended to lead to a denial of staff privileges, a per se approach still would not be appropriate. See, e.g., Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); Bhan, 929 F.2d at 1411-12. See generally 89 ALR Fed. 419, 451-56 (1988).
 
 2. Application of the Rule of Reason
 
 58
 To establish a Section 1 violation under the Sherman Act, a plaintiff must demonstrate three elements: (1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged (i.e., "antitrust injury").
 
 
 59
 McGlinchy v. Shell Chemical Co., 845 F.2d 802, 811 (9th Cir.1988); accord Eichman v. Fotomat Corp., 871 F.2d 784 (9th Cir.1989). The defendants argue that they are entitled to summary judgment on Austin's § 1 claim because he failed to present sufficient evidence of the existence of any of these elements. We do not address Austin's showing with respect to the first and second elements, because we conclude that he did not demonstrate that the non-immune acts of the defendants caused an injury to competition.
 
 
 60
 Austin made no showing that the refusals to "cover" or the public attacks restrained competition. At the most, these acts amounted to an informal and limited restraint on a single competitor in a single hospital. Austin was required to show not merely injury to himself as a competitor, but rather injury to competition. Even "the elimination of a single competitor, standing alone, does not prove anticompetitive effect." Kaplan v. Burroughs Corp., 611 F.2d 286, 291 (9th Cir.1979) (emphasis added); accord Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 734 (9th Cir.1987). This is the thrust of the third element of the McGlinchy test, which requires "injury to competition, beyond the impact on the claimant." McGlinchy, 845 F.2d at 811 (emphasis added). Thus, even if the refusals to "cover" and the verbal attacks did constrain Austin in some way, there is still no basis for finding an injury to competition.[11]
 
 
 61
 B. Are Defendants Entitled to Summary Judgment on Austin's Section 2 Claim?
 
 
 62
 Austin also contends that the defendants violated § 2 of the Sherman Act by "maintain[ing] [a] monopoly over the neurosurgical practice in Santa Barbara." Austin can avoid summary judgment on this claim only if he establishes the defendants' "(1) possession of monopoly power in a relevant market; (2) willful acquisition or maintenance ('use') of that power; and (3) causal antitrust injury." Eichman, 871 F.2d at 796 (citing Catlin v. Washington Energy Co., 791 F.2d 1343, 1347 (9th Cir.1986)). The problem with this claim, as in the case of the § 1 claim, is that there is no basis for the suggestion that the defendants' few non-immune acts constituted a "causal antitrust injury." Because there was no indication of an injury to competition, there was no cognizable antitrust injury. See McGlinchy, 845 F.2d at 811 (antitrust injury is anticompetitive effect, not injury to competitor). As a result, we conclude that Austin's § 2 claim does not survive summary judgment.
 
 CONCLUSION
 
 63
 HCQIA provides the defendants with immunity for their professional review actions, which commenced after November 14, 1986. It also provides immunity for their professional review activity related to those actions, no matter when that activity occurred. Austin's antitrust claims based on the few non-immune actions of defendants cannot survive summary judgment; the district court's error in failing to address their antitrust merits was harmless.
 
 
 64
 AFFIRMED.
 
 PREGERSON, Circuit Judge, dissenting:
 BACKGROUND
 
 65
 On November 19, 1986, the Cottage Hospital Medical Executive Committee ("MEC") recommended that the hospital privileges of Dr. George Austin, a neurosurgeon, be revoked. Dr. Austin then brought an action in federal district court against five physicians, four of them neurosurgeons, and Cottage Hospital. The suit alleged that the physicians and the hospital had violated the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 (1988), by conspiring or acting in concert to shut down Dr. Austin's neurosurgery practice in the Santa Barbara area.
 
 
 66
 Defendants moved for summary judgment on the grounds that (1) their actions were immune under the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. §§ 11101-11152 (1988) and (2) there was no genuine issue of fact whether a conspiracy existed or whether any injury to competition had occurred.
 
 
 67
 HCQIA came into effect three days before Dr. Austin's actual suspension and nearly ten months after the beginning of the investigation into Dr. Austin's practice. The district court, nonetheless, granted defendants' motion for summary judgment. It held that the decision to suspend and revoke Dr. Austin's hospital privileges was immune under HCQIA.
 
 
 68
 On appeal, Dr. Austin contends that the district court erred in applying HCQIA's immunity provisions because the review process involving Dr. Austin was initiated and essentially completed before the effective date of the statute, November 14, 1986. Dr. Austin also argues that the district court erred in finding that HCQIA's fairness standards (42 U.S.C. § 11112(a)) were met.
 
 
 69
 The majority agrees with the district court that immunity applies to the decision to suspend and revoke Dr. Austin's hospital privileges. The district court never considered whether the immunity provisions applied retroactively to the review process that was conducted before the statute's effective date. The majority opinion therefore goes beyond the district court's decision by applying HCQIA's immunity provisions retroactively to cover investigations of Dr. Austin's practice occurring before the effective date of the statute. The majority also deals with the merits of Dr. Austin's antitrust claim which the district court did not reach.
 
 
 70
 I dissent for the following reasons. First, I disagree with the majority's application of the immunity provisions of HCQIA. The investigation of Dr. Austin's practice was essentially completed before November 14, 1986, the effective date of the statute. Only the decision to suspend Dr. Austin's hospital privileges occurred after the effective date. I believe that none of the defendants' activities regarding the investigation of Dr. Austin's practice or his ultimate suspension are immune under HCQIA.
 
 
 71
 Second, the majority concludes that HCQIA's fairness provisions, 42 U.S.C. § 11112(a), were satisfied in this case. I disagree. In particular, I believe that the decision to suspend and revoke Dr. Austin's hospital privileges was not reasonably warranted by the facts, and therefore violates the requirements set forth in 42 U.S.C. § 11112(a)(4).
 
 
 72
 Finally, I disagree with the majority's decision to reach the merits of Dr. Austin's antitrust claim. The district court did not reach this issue, and thus conducted no factfinding that would support the majority's decision. The issues raised by Dr. Austin's antitrust claim are fact-intensive and should be resolved in the first instance in the district court.
 
 I.
 
 73
 The majority concludes that the actual decision to suspend and revoke Dr. Austin's hospital privileges is immune under HCQIA. The majority further concludes that the investigatory and review activities preceding that decision are immune as well even though those activities were completed before the effective date of HCQIA. I disagree.
 
 
 74
 I do not believe that the statutory language and legislative history of HCQIA support the majority's conclusion that both the investigatory activities and the actual decision to suspend Dr. Austin are immune under the statute.
 
 
 75
 In Dr. Austin's case, the record shows that several committees conducted extensive investigations of Dr. Austin's medical practice from January to November 1986. Only the decision to suspend and revoke privileges took place after November 14, 1986, HCQIA's effective date. Though this decision took place three days after HCQIA took effect, it is part of extensive review activity that occurred entirely before the effective date of the statute.
 
 
 76
 The decision to suspend Austin was merely the culmination of peer review which began months before HCQIA's effective date. HCQIA, therefore, provided no "incentive" for professional peer review in this context because that review was essentially completed before HCQIA's effective date.[1] The defendants who conducted the peer review were simply not looking to HCQIA for "protection." There is no reason to apply the statute in the context of this case.
 
 II.
 
 77
 Even if immunity could apply to the revocation decision, I do not believe that it should apply in this case. Immunity applies only where the fairness standards of 42 U.S.C. § 11112(a) are met.[2] HCQIA creates a rebuttable presumption that section 11112(a) is satisfied absent a contrary showing by a preponderance of evidence.
 
 
 78
 Based on the record before us, I believe that sufficient evidence exists to rebut the presumption of fairness.
 
 
 79
 Congress enacted the fairness standards out of a concern that limited immunity under the Act "might be abused and serve as a shield for anti-competitive economic actions under the guise of quality controls...." H.R.Rep. No. 903, 99th Cong., 2d Sess. 9, reprinted in 1986 U.S.Code Cong. & Admin.News 6391. Section 11112(a) reflects Congress's intent "to encourage good faith professional review activities of health care entities...." Id. at 6384.
 
 
 80
 Section 11112(a)(4) provides that an action is immune only if it is taken "in the reasonable belief that the action was warranted by the facts known...."[3] Contrary to the majority opinion, I do not believe that the district court properly determined that section 11112(a)(4) was satisfied. As I see it, there is sufficient information in the record that could arguably demonstrate that a reasonable jury could conclude that the revocation of Dr. Austin's hospital privileges was not warranted by facts known to the defendants.
 
 
 81
 On appeal, Dr. Austin relies heavily upon the findings of the Judicial Review Committee ("JRC").[4] This committee extensively reviewed the evidence considered by the defendants when they suspended Dr. Austin's hospital privileges. Dr. Austin argues that the JRC's conclusions support his contention that the defendants failed to satisfy section 11112(a)(4).
 
 
 82
 I agree. An examination of the JRC's findings satisfies me that if a jury were presented with the information garnered by the defendants, it could reasonably conclude that Dr. Austin's suspension was not warranted by a preponderance of the evidence.
 
 
 83
 The JRC concluded in its June 1987 report that it "was persuaded that the preponderance of the evidence favors Dr. Austin and ... that the recommendation of the Medical Executive Committee was not reasonable and warranted and that the clinical privileges of Dr. Austin should not be revoked." (Emphasis added.) The JRC went on to recommend that certain conditions be attached to Dr. Austin's staff privileges.
 
 
 84
 The majority opinion acknowledges the significance of the JRC's finding that the suspension of Dr. Austin's privileges was unreasonable. The majority nonetheless accepts the district court's conclusion that the conditions suggested by the JRC for Dr. Austin's reinstatement and the JRC's expressed concern for some of Dr. Austin's work somehow vitiate the significance of the JRC's major conclusion that Dr. Austin's suspension was unreasonable.[5] The majority agrees with the district court that the JRC recommendation was "far short of complete vindication for the Plaintiff." Austin v. McNamara, 731 F.Supp. at 937. The majority thus accepts the district court's conclusion that the JRC's lack of complete vindication of Dr. Austin constitutes sufficient evidence that the defendants reasonably believed that the revocation was warranted by the facts known.
 
 
 85
 I disagree with this analysis. The JRC believed by a preponderance of evidence that the revocation was unreasonable and not warranted by the facts known. This conclusion belies the district court's view that section 11112(a)(4) was satisfied. The district court and the majority are saying in effect that a jury could not reasonably arrive at the same conclusion reached by the JRC, namely that the suspension of Dr. Austin's hospital privileges was unreasonable.
 
 
 86
 I believe that if a jury had before it information examined by the JRC, it reasonably could conclude that the conduct of the defendants did not comply with section 11112(a)(4). For example, the JRC found only one instance where Dr. Austin's performance fell below the applicable standard of care. The JRC expressed concern about three other cases but found that the proof was evenly balanced. The JRC had concern about a fifth case but concluded that Dr. Austin's conduct was not below the applicable standard.
 
 
 87
 In all other respects, the JRC found that Dr. Austin's professional conduct was not below the applicable standard for all cases reviewed. This is a far cry from the 103 instances of substandard conduct allegedly relied upon by the defendants. The JRC attributed some of the discrepancy between its findings and those of the defendants to the fact that the neurosurgeons could not objectively monitor Dr. Austin's neurosurgical practice.
 
 
 88
 The findings of the JRC also indicate that the suspension was unreasonable because the defendants ignored the recommendation of the external committee. In August 1986, this committee suggested that the hospital monitor Dr. Austin's work for six more months. However, the six-month period of monitoring was cut short when, just three months later in November, the hospital revoked Dr. Austin's privileges. Between August and November the only review that took place consisted of five case reviews of Dr. Austin's work by some of his fellow neurosurgeons.
 
 
 89
 Based on the foregoing, I dissent from the majority's opinion.
 
 
 
 [1]
 The defendants contend that there is no Sherman Act jurisdiction in this case. We find that, for the purposes of jurisdiction, Austin's allegations are on all fours with those in Pinhas v. Summit health, 894 F.2d 1024 (9th Cir.1989), aff'd, --- U.S. ----, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). We therefore reject defendants' challenge to our jurisdiction
 
 
 [2]
 Austin does not appeal the dismissal of the pendent state law claims; thus, only the antitrust claims are before this court
 
 
 [3]
 The defendants assert that Austin waived his right to challenge the district court's grant of summary judgment because he did not address the applicability of HCQIA in the district court. We find no fatal waiver. The defendants raised HCQIA as an affirmative defense. The issue is one of law, and no factual showing was required of Austin in response to the defense. The record is complete. We elect to address the issue
 
 
 [4]
 Austin grounds this suggestion on certain interactions between the other doctors and him. He alleges that: 1) the other neurosurgeons in the Santa Barbara area refused to "cover" for him; 2) Drs. St. John and Jones "openly demeaned Dr. Austin's work to nurses on staff at Cottage Hospital in order to develop animosity over [sic] Dr. Austin"; 3) the other neurosurgeons engaged in "aggressive attacks on Dr. Austin's judgment at the monthly meetings of the neursurgical [sic] group meetings [sic] at the Cottage Hospital."
 
 
 [5]
 A contrary holding would frustrate the apparent intent of Congress. The House Report on HCQIA stated that
 The Committee intends that these provisions allow defendants to file motions to resolve the issue of immunity in as expeditious a manner as possible. The provisions would allow a court to make a determination that the defendant has or has not met the standards specified in section [11112(a) ]. The Committee intends that the court could so rule even though other issues in the case remain to be resolved. For example, a court might determine at an early stage of litigation that the defendant has met the [11112(a) ] standards, even though the plaintiff might be able to demonstrate that the professional review action was otherwise improper.
 H.R.Rep. No. 903, 99th Cong., 2d Sess. 12, reprinted in 1986 Code Cong. & Admin.News 6394.
 
 
 [6]
 The JRC discussed Austin's treatment of five patients whose treatment had been the focus of the MEC's investigation. The JRC found that the proof was evenly balanced in three cases and that in one case Austin's conduct was not below the applicable standard
 
 
 [7]
 Section 416 of HCQIA is to be found in the U.S.Code among the "Historical and Statutory Notes."
 
 
 [8]
 Amici American Medical Association and California Medical Association contend that the JRC review of the November 19 revocation was not a separate action, but a continuation of the revocation action. Because nothing in this case turns on that issue, we need not resolve it
 
 
 [9]
 The interpretation of a statute is a question of law that we review de novo. Batchelor v. Oak Hill Medical Group, 870 F.2d 1446, 1447 (9th Cir.1989)
 
 
 [10]
 The district court held that the "action" occurred when the MEC voted to revoke Austin's privileges on November 19, 1986. That action was preceded, however, by Dr. McNamara's suspension of Austin's privileges on November 17, 1986. It is quite possible that the "action" affecting Austin's privileges commenced with the November 17 suspension, but that fact does not affect our decision; both events--Dr. McNamara's suspension and the MEC's revocation--occurred after the November 14 effective date of HCQIA
 
 
 [11]
 The one Ninth Circuit case that Austin cites as stating that injury to a competitor is sufficient, Pinhas v. Summit Health, actually undercuts his position. That case involved the district court's dismissal of Pinhas' complaint. We ruled (in a portion of the opinion not affected by the Supreme Court's opinion) that injury to Pinhas was sufficient to survive a motion to dismiss, but also indicated that a showing of injury to competition would be required at the summary judgment stage. Pinhas, 894 F.2d at 1032. Furthermore, Pinhas' complaint, unlike Austin's, alleged that he provided surgery more cheaply than his competitors; we placed great emphasis on this contention, stating that, in light of the allegation of lower prices, Pinhas might be able to demonstrate that his suspension allowed other doctors to charge higher prices. Id. Nowhere in Pinhas did we suggest that injury to Pinhas alone would constitute sufficient evidence of injury to competition
 
 
 [1]
 Congress passed HCQIA to meet "an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review." 42 U.S.C. § 11101(5) (emphasis added)
 
 
 [2]
 Section 11112(a) provides, in pertinent part,
 For purposes of the [immunity] protection ..., a professional review action must be taken--
 (1) in the reasonable belief that the action was in the furtherance of quality health care,
 (2) after a reasonable effort to obtain the facts of the matter,
 (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
 (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)....
 
 
 [3]
 Congress has interpreted the "reasonable belief" standard to mean a "more objective reasonable belief standard." See 1986 U.S.Code Cong. & Admin.News 6392-93
 The majority opinion concludes that Dr. Austin's proffer of evidence to show defendants' harmful intent or motive is irrelevant because of this objective standard. I disagree. Evidence of motive and intent is relevant to show whether the defendants possessed a reasonable belief that the final revocation was warranted by the facts known.
 Moreover, the legislative history discussing the due process requirements of section 11112 makes clear that it is essential that "physicians receive fair and unbiased review to protect their reputation and medical practices." 1986 Code Cong. & Admin.News at 6393. Any inquiry into the reasonableness of the reviewers' beliefs should at least consider any evidence of bias or ulterior motive even though an objective standard ultimately applies.
 
 
 [4]
 After his suspension, Dr. Austin requested a hearing pursuant to hospital policy before the JRC which was comprised of six impartial doctors
 
 
 [5]
 The district court held that even though the JRC found Dr. Austin's suspension to be unreasonable, a jury could find that the defendants had a reasonable belief that their decision was warranted. The district court relied in part on the fact that the JRC did in fact impose "significant restrictions" on the reinstatement of Dr. Austin's privileges
 There is some question, however, whether these conditions were significant restrictions on Dr. Austin's practice. The district court found that the conditions imposed were "significant restrictions that are out of the ordinary for a surgeon of Plaintiff's experience." Austin v. McNamara, 731 F.Supp. 934, 938 (C.D.Cal.1990). Dr. Austin produced the testimony of Dr. Henry W. Dodge who questioned the severity of the conditions. Dr. Dodge believed the conditions were to "be expected of any other physician practicing medicine and surgery in the state of California."