JEFFREY A. ZISK *vs.* QUINCY HOSPITAL & others.[1]

No. 04-P-985.

Middlesex. April 13, 2005. - September 14, 2005.

Present: GREENBERG, SMITH, & KATZMANN, JJ.

*Hospital,* Peer review. *Doctor,* Employment. *Health Care Quality Improvement Act. Statute,* Construction. *Practice, Civil,* Summary judgment.

In a civil action arising out of a peer review process conducted by a hospital regarding medical care provided by the plaintiff, a surgeon at the hospital, the judge correctly granted summary judgment in favor of the defendants (the hospital and two of its doctors who had participated in the review process) on the ground that the defendants were entitled to immunity for their actions under the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101 et seq. (1995) (act), where the plaintiff failed to raise a genuine issue of fact material to the determination whether, viewing the review process as an integrated whole, the defendants failed to meet one or more of the act's standards in their conduct of the review process. [523-528]

CIVIL ACTION commenced in the Superior Court Department on October 13, 1998.

The case was heard by *Diane M. Kottmyer,* J., on motions for summary judgment.

*Evan M. Slavitt* for the plaintiff.

*Leslie Lockard* for the defendants.

SMITH, J. Following the deaths of three surgical patients, the board of managers of defendant Quincy Hospital (hospital) suspended Dr. Jeffrey A. Zisk's privileges and ordered that he undergo additional training. Dr. Zisk (plaintiff) then brought an action in the Superior Court against the defendant hospital, Dr. Anthony J. Dragone, and Dr. Charles A. DiCecca.[2] The individual defendants were members of various peer review committees.

---

[1] Anthony J. Dragone and Charles A. DiCecca.

[2] Another individual defendant was dismissed pursuant to stipulation.

The plaintiff's complaint included claims for Federal and State constitutional violations against all defendants, and breach of contract and breach of the covenant of good faith and fair dealing against the hospital. He also asserted claims for tortious interference with contractual and advantageous relations, intentional and negligent infliction of emotional distress, and bad faith in the conduct of professional review proceedings pursuant to G. L. c. 231, § 85N, against the individual defendants.[3] The defendants moved for summary judgment, arguing that the Health Care Quality Improvement Act of 1986 (act), 42 U.S.C. §§ 11101 et seq. (1995), granted qualified immunity to health care entities and physicians who participate in professional peer review processes. After a hearing, a Superior Court judge allowed the defendants' motion for summary judgment. The judge also ruled that the plaintiff's claim against the individual defendants for interference with contractual relationships was not legally actionable. On appeal, the plaintiff argues that the judge failed to apply the correct standard of review for summary judgment, failed to interpret the facts in the light most favorable to the plaintiff, the nonmoving party, and misapplied the controlling precedents concerning immunity under the act.[4] For the reasons stated herein, we affirm the judgment of the Superior Court.

*Background.* The facts, viewed in the light most favorable to the plaintiff, as established by the summary judgment record, are as follows. The plaintiff obtained staff privileges at the hospital in September of 1992, and became board certified in surgery in 1993. He performed both general and vascular surgery. By October of 1995, he had operated on patients approximately 600 times at the hospital.

The hospital had recruited the plaintiff to provide an alternative to Quincy Surgical Associates (QSA), a group practice that performed most of the surgeries at the hospital. In the summer

---

[3]The plaintiff's claims of antitrust violations, breaches of confidentiality and privacy, and violation of G. L. c. 93A, against all defendants, and his defamation claim against the individual defendants were dismissed on earlier motions.

[4]The plaintiff's brief does not argue that the motion judge erred in disposing of the State law claims. Therefore, the issues are waived and we do not address them. Mass.R.A.P. 16(a)(4), 365 Mass. 762 (1974).

of 1994, the plaintiff began sharing office space with QSA. Dr. Dragone, chief of surgery at the hospital and a partner at QSA, encouraged the plaintiff to join QSA. The plaintiff declined, but did pay a share of QSA's overhead, and QSA's staff provided him with secretarial services.

In a nineteen-month period, three of the plaintiff's surgical patients died following surgery. As a result, the hospital's peer review process commenced. We recite the details of the three patients.

*Patient one.* On September 26, 1994, the plaintiff performed abdominal surgery on an eighty-seven year old woman. It was not emergency surgery, and the plaintiff knew that her chances of surviving the operation were very poor. Prior to the surgery, the plaintiff was aware that two more experienced surgeons had begun operating on the patient but terminated the surgery when they discovered that her large and small bowels had adhered together because of scar tissue. Before starting the 1994 surgery, the plaintiff spoke to one of the surgeons who had participated in the previous surgery, and he informed the plaintiff that it would not be advisable to operate and refused to assist the plaintiff. The plaintiff then asked another surgeon to assist in the surgery without informing the surgeon that another surgeon had already refused to participate.

After the plaintiff had begun to perform the surgery, the assisting doctor warned the plaintiff that he should stop the procedure because the death of the patient could result. The assisting doctor repeatedly urged the plaintiff to stop the surgery. The patient started to hemorrhage, and the doctors could not stop her bleeding. She died that night as a result of excessive blood loss.

*Patient two.* In October of 1995, the plaintiff operated on an eighty-seven year old woman who had a history of coronary and pulmonary disease. She had been admitted to the hospital because of acute lower gastrointestinal bleeding. The plaintiff suspected that she had cancer of the rectum even though he was aware that a previous biopsy was negative for cancer. He failed to obtain a positive biopsy or a pathology report stating that the patient did indeed have cancer before he proceeded to operate on her.

The plaintiff agreed that a reasonable physician would believe that a positive biopsy should have been obtained before operating on the eighty-seven year old woman. The final pathology report for patient two indicated no cancer was present. The plaintiff admitted during the peer review process that patient two, even if she had had cancer, could have lived for months and or even years before her cancer would have become life threatening. Patient two died shortly after the surgery.

*Patient three.* On March 9, 1994, the plaintiff operated on an eighty-five year old woman believing that she was suffering from pancreatitis caused by gallstones. Testing before the operation had not confirmed the presence of gallstones. The patient had a history of heart problems and had suffered a heart attack some four months before the operation. A cardiologist and an anesthesiologist both stated before the surgery that there was a significant risk of a heart attack during surgery. The plaintiff admitted that the patient was not in a life-threatening situation before he operated on her.

The plaintiff's postoperative report did not indicate that he found any gallstones. The patient died within a few days of the surgery from a heart attack. A pathologist who examined the patient's gallbladder after the plaintiff removed it did not find any gallstones.

*The peer review process.* After patient two died, the pathology department reported to Dr. Dragone, as he was chief of surgery, that tissue removed from the patient during the surgery disclosed that she did not have cancer. After Dr. Dragone reviewed the patient's chart, he notified the hospital's chief executive officer of the results of the plaintiff's surgery on patient two.

In accordance with the bylaws of the hospital's medical staff, the matter was presented to the hospital's quality assurance and improvement (QA&I) committee in October of 1995.[5] The

---

[5]The QA&I committee is a medical peer review committee as defined by G. L. c. 111, § 1. It is charged with "the investigation, review and resolutions" of reports indicating a health care provider's "incompetency in his specialty or conduct that might be inconsistent with or harmful to good patient care or safety." G. L. c. 111, § 203, inserted by St. 1986, c. 351, § 9. Once the plaintiff's case was presented to the QA&I committee, the peer review process began.

QA&I committee consisted of nine physicians, including all clinical departments of the hospital. The members were appointed by the president of the medical staff. At the time that the QA&I committee was notified of the patient two matter, it was already investigating the plaintiff's care in regard to patient one. In view of the two investigations, the QA&I committee recommended that the plaintiff take a voluntary leave of absence; if he had refused, a summary suspension would have been put into place. The plaintiff agreed to take a voluntary leave of absence.

The QA&I committee appointed an ad hoc subcommittee (subcommittee) to undertake a review of the plaintiff's care of several patients. One of the defendants, Dr. DiCecca, who was vice-president of the hospital's medical staff, chaired the subcommittee. He also was a voting member of the QA&I committee. Dr. Dragone was a member of the QA&I committee but was not a member of the subcommittee, although he attended several subcommittee meetings.

The QA&I committee requested Dr. Dragone to select the plaintiff's cases that were problematic from a medical care perspective. Those cases had been previously reviewed and discussed by the department of surgery at morbidity and mortality meetings over the previous two years. The subcommittee reviewed eighteen of the plaintiff's cases and found eight of them, including those of patients one, two, and three, to be troubling. Dr. DiCecca, on behalf of the subcommittee, retained an outside expert, a general surgeon, to give an opinion as to the quality of the plaintiff's care of the patients in those eight cases. After a review, the expert criticized the plaintiff's care in each of the eight cases. At that point, the plaintiff was asked to attend the subcommittee meetings to discuss his care of each of those patients. He was accompanied by his attorney. Before meeting with the subcommittee, the plaintiff reviewed the records of the eight cases and also reviewed the summaries of the cases made by the hospital's director of professional review. During the hearing, the plaintiff pointed to factual errors made in the summaries that had been presented to the subcommittee.

After completing its review, the subcommittee reported to the QA&I committee that it found that the plaintiff's problems were

poor judgment and poor attitude, with both patients and other doctors, rather than poor technical skills. The QA&I committee adopted the subcommittee's findings and recommended to the hospital's medical executive committee (MEC) corrective action of a one-year specialized residency program focusing on improvement of clinical judgment.

The MEC consisted of sixteen physicians including Dr. Dragone. Dr. DiCecca, as chairman of the QA&I committee, presented to the MEC the eight cases that were the subject of the investigation by the QA&I committee. According to the MEC's minutes of the meeting, all of the eight cases were reviewed, using the summaries prepared by the outside expert. The MEC adopted the QA&I committee findings and recommended that the plaintiff complete one year of corrective training to improve his surgical judgment and submit to monitoring and supervision for two to three years.

The plaintiff appealed the MEC's decision, exercising his right under the hospital's medical staff bylaws to a fair hearing. The fair hearing committee (FHC) then conducted a de novo review of the evidence, which included medical records and testimony. None of the FHC members had been involved in any of the prior review processes, nor were they surgeons in competition with the plaintiff. The plaintiff was represented by counsel, presented evidence, and testified before the FHC. He pointed out errors in the patient care summaries. After the hearing concluded, the FHC issued a detailed report of its findings and recommendations. The FHC found that the plaintiff's care of the three patients, i.e., patients one, two, and three, "significantly departed from the [appropriate] standard of care and was detrimental to patient safety," and made detailed findings on each of the three patients.[6] The FHC found that the plaintiff "attempted procedures that were clearly inappropriate and life-threatening" and that corrective action was required. The FHC recommended four years of monitoring, rather than the one year of residency.

The MEC reconvened and accepted the FHC findings, but rejected its recommendation regarding corrective action. The

---

[6] The FHC found that the plaintiff's care of the patients in the other five cases met the proper standard of care.

MEC's final report indicates that the "MEC strongly believes that, without the foundation of additional training that will assist [the plaintiff] to retool his clinical and surgical judgment skills, the type of monitoring recommended by the FHC will be insufficient to ensure patient safety." The report described the plaintiff as "a young surgeon who rushes to perform non-emergency surgery on high risk patients despite the advice of his colleagues and, in two cases, without establishing a proper diagnosis." The report concluded that a "recommendation to undergo additional training is not punitive, but protective and corrective." The MEC modified its initial recommendation of a one-year residency to require the plaintiff to complete a two-year residency.

The next peer review process available to the plaintiff was the hospital's appellate review body (ARB), which consisted of three physicians who had not participated in any of the previous peer review proceedings and three members of the hospital's board of managers. The plaintiff's attorney was allowed to make an oral argument and also submitted a brief. The ARB reviewed the findings of the MEC and ordered that the plaintiff submit to one year of additional training, followed by four years of monitoring. The board of managers imposed the recommended corrective action.

The Massachusetts Board of Registration in Medicine (board) also investigated the plaintiff's care of patients one, two, and three. It obtained the opinion of an outside expert. The expert opined that the plaintiff displayed poor judgment in operating on those three patients. The plaintiff subsequently entered a consent order that allowed the board to impose discipline in lieu of an adjudicatory hearing. The order stated that the plaintiff was negligent in the treatment of those three patients and restricted the plaintiff's surgical practice.

We now turn to the analysis of the errors raised on appeal by the plaintiff.

*Discussion. Immunity under the act.* The plaintiff argues that the judge erred in granting summary judgment for the hospital when "an abundance of genuine issues of material fact" existed as to the applicability of immunity to the hospital's professional review action under the act.

1. *Brief history of the act.* In 1986, Congress passed the act "to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior." *Mathews* v. *Lancaster Gen. Hosp.*, 87 F.3d 624, 632 (3d Cir. 1996), quoting from H.R. Rep. No. 903, 99th Cong., 2d Sess. 2 (1986), reprinted in 1986 U.S.C.C.A.N. 6287, 6384. "Congress believed incompetent physicians could be identified through 'effective professional peer review,' which it chose to encourage by granting limited immunity from suits for money damages to participants in professional peer review actions."[7] *Mathews* v. *Lancaster Gen. Hosp.*, *supra*, quoting from 42 U.S.C. §§ 11101(5), 11111(a) (1988 & Supp. IV 1992).

"The [act] mandates that a health care entity's review of the competence of a physician shall not result in its liability" if the review comports with certain requirements outlined in the act. *Singh* v. *Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 31 (1st Cir. 2002). "In order for immunity to attach to a professional review action, it must be taken — (1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)." *Id.* at 31-32, quoting from 42 U.S.C. § 11112(a). See, e.g., *Egan* v. *Athol Memorial Hosp.*, 971 F. Supp. 37, 42 (D. Mass. 1997), aff'd, 134 F.3d 361 (1st Cir. 1998).

2. *The summary judgment standard to be applied under the act.* The act establishes a rebuttable presumption that the peer

---

[7]"On its face, [42 U.S.C. § 11111(a)(1)] does not explicitly establish immunity from suit," but from liability for damages only. *Bryan* v. *James E. Holmes Regional Med. Center*, 33 F.3d 1318, 1322 n.3 (11th Cir. 1994), cert. denied, 514 U.S. 1019 (1995), quoting from *Decker* v. *IHC Hosps., Inc.*, 982 F.2d 433, 436 (10th Cir. 1992). Nevertheless, the vast majority of suits challenging peer review proceedings should be resolved at or before the summary judgment stage. See *Bryan* v. *James E. Holmes Regional Med. Center*, *supra* at 1332 & n.25.

review actions have been conducted in accordance with the act. See *Singh* v. *Blue Cross/Blue Shield of Mass., Inc., supra* at 32; *Egan* v. *Athol Memorial Hosp., supra; Birbiglia* v. *Saint Vincent Hosp., Inc.,* 427 Mass. 80, 84 n.4 (1998). A plaintiff can only "overcome [the act's] immunity at the summary judgment stage . . . if he demonstrates that a reasonable jury could find that the defendants did not conduct the relevant peer review actions in accordance with one of the [act's] standards." *Singh* v. *Blue Cross/Blue Shield of Mass., Inc., supra.* In this case, summary judgment would not be appropriate if the plaintiff raised a genuine issue of fact material to the determination whether, viewing the review process as an integrated whole, the hospital failed to meet one or more of the act's standards. "Whether defendants are entitled to immunity under the [act] is a 'question of law for the court to decide whenever the record is sufficiently developed.' " *Egan* v. *Athol Memorial Hosp., supra.* We apply "an objective standard of reasonableness when considering whether a defendant has met the statutory requirements." *Ibid.* See, e.g., *Mathews* v. *Lancaster Gen. Hosp., supra* at 638 (objective standard met when "peer reviewers reasonably conclude that their actions will restrict incompetent behavior or protect patients"). See also *Birbiglia* v. *Saint Vincent Hosp., Inc., supra.* In this case, after reviewing the summary judgment record, we conclude that, under the act, immunity properly attached to the actions of the peer review committees and members.[8]

a. *Reasonable belief that actions were in furtherance of quality health care.* The plaintiff asserts that Dr. Dragone acted in bad faith because he was angry that the plaintiff refused to join the QSA practice and, furthermore, that Dr. Dragone was in direct economic competition with him. Thus, the plaintiff argues that Dr. Dragone's involvement in the peer review process denied the plaintiff the ability to receive a fair hearing. The plaintiff asserts that the degree and nature of Dr. Dragone's participation is a disputed issue of material fact.

The hospital responds that the plaintiff's "allegations about Dr. Dragone's alleged anti-competitive motives are both ir-

---

[8]We think the result would be the same under the comparable State law immunizing medical peer review committees, G. L. c. 111, § 203(*c*).

relevant and unsupported by the record." Other courts have refused to consider allegations of bad faith, ruling that "a defendant's subjective bad faith is irrelevant under § 11112(a)[,] and have upheld a finding of immunity if, on the basis of the record, the court could conclude that the professional review action would further quality health care." *Mathews* v. *Lancaster Gen. Hosp.*, *supra* at 635. See *Birbiglia* v. *Saint Vincent Hosp., Inc.*, *supra*. We agree, without determining whether bad faith actually existed in this case, that the "test is an objective one, so bad faith is immaterial." *Bryan* v. *James E. Holmes Regional Med. Center*, 33 F.3d 1318, 1335 (11th Cir. 1994), cert. denied, 514 U.S. 1019 (1995).

To overcome the presumption of the act, a plaintiff "must demonstrate that a reasonable jury could find that [the hospital] could not have 'concluded that [its] action would restrict incompetent behavior or would protect patients.' " *Singh* v. *Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d at 41, quoting from *Egan* v. *Athol Memorial Hosp.*, *supra*. We agree with the analysis of the Superior Court judge and conclude that the plaintiff has failed to demonstrate, by a preponderance of the evidence, that the hospital's actions were not reasonably in furtherance of quality health care, where the record reflects that the peer review committees considered patient safety an absolute priority.

b. *Reasonable effort to obtain the facts.* The defendants are not required to provide a perfect investigation, but a reasonable one. *Egan* v. *Athol Memorial Hosp.*, *supra* at 43. The plaintiff argues that the patient care summaries contained factual errors and, furthermore, that Drs. Dragone and DiCecca knowingly provided false information to the FHC. The plaintiff also argues that the peer review process, and the determination of a pattern of poor judgment on his part, cannot fairly be based on three cases out of approximately 600. The question we must answer is "whether the totality of the process leading up to the . . . 'professional review action' . . . evidenced a reasonable effort to obtain the facts of the matter." *Mathews* v. *Lancaster Gen. Hosp.*, *supra* at 637. "The real issue is the sufficiency of the basis for the [hospital's] actions." *Bryan* v. *James E. Holmes Regional Med. Center*, *supra*, quoting from *Austin* v. *McNamara*, 979 F.2d 728, 734 (9th Cir. 1992).

The record reflects a careful and thorough review of all the evidence, and that the plaintiff had the opportunity to challenge any errors in the record. The evidence before us "is insufficient to rebut the presumption that [the] defendants complied with the standard of fact gathering set forth in" the act. *Egan* v. *Athol Memorial Hosp., supra* at 43.

c. *Adequacy of notice and opportunity to be heard.* We agree with the judge's analysis that the act provides a safe harbor if certain procedural requirements are met. These include the right to be represented by counsel, to call and examine witnesses, to present evidence and submit a written statement, and to receive a record of the proceedings and written report detailing the basis for the final decision. See 42 U.S.C. § 11112(b). The record supports that all of these procedural protections were provided to the plaintiff.[9]

d. *Reasonable belief that corrective action was warranted.* In this evaluation, the court "must not reweigh the evidence or substitute its own judgment for that of the peer review committee." *Egan* v. *Athol Memorial Hosp., supra* at 44. "The appropriate inquiry is 'whether the decision was reasonable in light of the facts known at the time the decision was made, not in light of facts later discovered.' " *Ibid.*, quoting from Sklaroff *vs.* Allegheny Health Educ. Research Foundation, U.S. Dist. Ct., No. 95-4758, (E.D. Pa. July 8, 1996). The MEC expressed concern that the plaintiff was "a young surgeon who rushes to perform non-emergency surgery on high risk patients despite the advice of his colleagues and, in two cases, without establishing a proper diagnosis." The MEC also expressed serious concern for patient safety and concluded that a "recommenda-

---

[9]The plaintiff mentions in his brief an alleged conflict of interest that occurred at the FHC hearing. According to the plaintiff, the attorney advising the FHC and the attorney defending the decision to discipline him were employed by the same law firm. The plaintiff does not point to any specific ruling of the FHC during the hearing that prejudiced him. In any event, the plaintiff's passing reference, devoid of any record citations or case law, does not amount to sufficient appellate argument. Mass.R.A.P. 16(a)(4), 365 Mass. 762 (1974).

We note, however, that peer review committees at hospitals should be aware that the practice of having the same law firm be involved in both giving legal advice to a review committee and presenting evidence before the committee could raise serious problems in some circumstances.

tion to undergo additional training is not punitive, but protective and corrective." There is no evidence in the record that those concerns were exaggerated or unfounded. We conclude that the plaintiff has failed to adduce any evidence to rebut the presumption that the review action was taken with the reasonable belief that corrective action was warranted.

*Conclusion.* For the reasons stated herein, we conclude that the plaintiff has failed to offer sufficient evidence to show any genuine issue of material fact to rebut the presumption that the review process comported with the requirements of the act. As such, we conclude that the actions of the defendants were immunized by the act.

The defendants' motion for summary judgment was properly allowed.

*Judgment affirmed.*