MEMORANDUM OPINION
 

 MYRON H. THOMPSON, Chief Judge.
 

 Plaintiff Robert E. Burney, M.D., has brought this lawsuit against defendants East Alabama Medical Center, InterQual, Inc., and several of their respective officers and agents for fraud, misrepresentation, and deceit in violation of §§ 6-5-100 through 6-5-104 of the 1975 Alabama Code (Michie 1993). Dr. Burney seeks compensatory and punitive damages arising out of representations made to him by East Alabama officers in the course of the hospital’s peer review of his surgical practice. The court has jurisdiction based on diversity of citizenship. 28
 
 *1517
 
 U.S.C.A. § 1332 (West 1993). This lawsuit is now before the court on the defendants’ motion for summary judgment, claiming immunity under the Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.CA §§ 11101 through 11152 (West 1995). For the following reasons, the defendants’ motion will be granted.
 

 I. BACKGROUND
 

 The facts viewed in the light most favorable to Dr. Burney are as follows:
 

 • Dr. Burney is a board-certified neurosurgeon who had practicing privileges at East Alabama between 1976 and 1994. During this time, he had various hospital appointments, including serving as Chief of the Peer Review Committee, Chief of Surgery, and Chief of Staff. In addition, in 1980, he was President of the Neurosurgical Society of Mabama.
 
 [1]
 

 • There were differences between Dr. Burney and East Alabama over the years. Dr. Burney participated with investors and 26 other practicing physicians in an attempt to open a competing hospital in the AuburnOpelika area. As part of their effort, the group created Auburn Medical Center, Inc. The new hospital never opened, and litigation ensued between East Alabama and Auburn Medical Center, Inc.
 
 [2]
 

 • In 1987, after receiving a law degree, Dr. Burney associated with a law firm that represented plaintiffs in medical malpractice suits. Shortly thereafter, he was pressured into resigning from the Peer Review Committee.
 
 [3]
 
 In 1990, he notified East Alabama that he would no longer provide neurosurgery trauma care because he believed the staffing and capabilities of East Aabama were inadequate.
 
 [4]
 

 • In 1991, the Joint Commission on the Accreditation of Healthcare Organizations twice cited East Aabama for lack of documentation of surgical case review for neurosurgeries.
 
 [5]
 
 Dr. Burney was informed that the Commission had ‘“cited the Medical Staff for not having adequately performed surgical case review’ including neurosurgery.”
 
 [6]
 
 In response, East Aabama contracted with InterQual, an outside consultant, to perform a review of neurosurgical procedures performed at the hospital.
 
 [7]
 
 InterQual hired two well-qualified neurosurgeons to do the review and prepared a report on their results, which was submitted to East Aabama in January 1993. The 1993 report found that there were problems with neurosurgery performance: there were “either departures from generally recognized surgical performance standards or departures from best practice neurosurgery standards.”
 
 [8]
 

 • After meetings with InterQual, legal counsel, and other hospital executives and based on InterQual’s 1993 report, East Aabama’s Chief of Staff concluded that the hospital’s by-laws would permit the suspension or termination of Dr. Burney’s hospital privileges. However, the Chief of Staff decided that the hospital should implement corrective action, and he referred the matter to the Medical Executive Committee.
 
 [9]
 

 • On July 21, 1993, the Medical Executive Committee met and recommended the establishment of a special program to review neurosurgeries. The special review program had two parts: First, InterQual would develop “criteria” for “back surgery ... with input from the surgeons who perform back surgery”; and, second, “100% of all discectomies, laminectomies/spinal fusions and related back surgery” performed by Dr. Burney
 
 *1518
 
 and certain other East Alabama surgeons would “be reviewed against the Criteria.”
 
 [10]
 

 • The President and the Chief of Staff of the hospital jointly informed Dr. Burney about the special review program and invited him to meet with InterQual to discuss not only the proposed criteria but also InterQual’s assessment of his performance in the 1993 report.
 
 [11]
 
 A meeting between Dr. Burney and InterQual reviewers was held on August 18,1993, and Dr. Burney’s objections were noted.
 
 [12]
 

 • On August 28, 1993, East Alabama’s Board of Directors approved the special review program, and InterQual then proceeded to develop the criteria.
 

 • On October 5, the Medical Executive Committee approved the criteria developed by InterQual. In a letter to Dr. Burney dated October 6, East Alabama’s President enclosed the final criteria and wrote that “The Executive Committee of the Medical Staff recommended to the Board that 100% of your lamineetomies/spinal fusions be retrospectively reviewed against the criteria. This review will be performed by InterQual and its physician consultants. The East Alabama Board of Directors ... approved the Executive Committee’s recommendation____ This review will begin as of October 15,1993. We appreciate your cooperation in improving care at East Alabama.”
 
 [13]
 

 • The following week, Dr. Burney wrote to the Medical Executive Committee objecting to the implementation of the criteria and offering both general and very specific criticisms of them.
 
 [14]
 
 His letter was apparently referred to InterQual, and, in a letter to East Alabama dated October 18, 1993, InterQual responded to some of Dr. Burney’s specific criticisms. InterQual explained to the hospital that “these Guidelines will not restrict what the surgeon believes is necessary for the care of his patient. But a hospital can chose [sic] to refuse permission for procedures it deems inappropriate. A surgeon continues such disavowed practices at his peril for continued medical staff membership.”
 
 [15]
 

 • In an October 26 letter, East Alabama’s Chief of Staff and its President then wrote Dr. Burney. They stated to him that “The criteria is [sic] simply a guide to allow the medical staff and board to evaluate the efficacy of lamineetomies/spinal fusions at East Alabama. You as a clinician will make the decision for surgery. If you disagree with an indication for surgery based on the criteria you can still use your judgement to perform surgery. It will be incumbent on you to document your reasoning in the medical record for your decision.”
 
 [16]
 

 
 *1519
 
 • In November 1993, East Alabama arranged for the back surgery criteria to be reviewed for appropriateness and applicability by Professor Morawetz, Director of the Division of Neurosurgery at the University of Alabama at Birmingham Medical School. Dr. Morawetz stated that the criteria are “very detailed and clear, and ... are applicable in Boston, Massachusetts; Opelika, Alabama; or any other place in the United States.”
 
 [17]
 

 • Sometime in the fall of 1993, Dr. Burney announced his intention to retire in the summer of 1994.
 
 [18]
 

 • In June 1994, InterQual completed its review and filed a report with East Alabama. In the 1994 report, InterQual indicated that Dr. Burney had failed to meet the ease selection criteria more often in 1994 than he had before the special review program began. Dr. Burney’s “Not indicated” surgeries, according to the report, actually “increased” by 1%, from 75% to 76%, while the “Not indicated” surgeries for the other two physicians under review “decreased” by 55% and 43%, respectively.
 
 [19]
 
 Ten days later, on June 14, Dr. Burney performed his “last surgery” at East Alabama.
 
 [20]
 

 • On July 7, the Chief of Staff submitted findings to the Medical Executive Committee. In those findings, the Chief of Staff stated that Dr. Burney “has failed to act in accordance with the Special Review Program”; that the program had been “enacted as Corrective Action”; that the program is “a Policy of the Medical Center”; and that “the failure of the Physician to act in accordance with the Special Review Program is a violation of Section 11.4-2 of the Bylaws and the Policy of the Medical Center.”
 
 [21]
 
 The Chief of Staff suspended Dr. Burney from East Alabama and sent him notice to that effect
 
 [22]
 

 • Dr. Burney learned from the July 7 notice that his suspension was based on his failure to comply with the special review program’s criteria.
 
 [23]
 

 • The Medical Executive Committee affirmed InterQual’s 1994 report, accepted the Chief of Staff’s findings, and approved the suspension of Dr. Burney.
 
 [24]
 

 • As authorized by the by-laws and as encouraged by East Alabama, Dr. Burney requested an administrative hearing to review his suspension. A hearing was held on December 8, 1994, before a panel of three physicians and a presiding hearing officer, and briefs were submitted. The panel did not recommend suspension. Instead, it found that “Dr. Burney did make an attempt to follow [InterQual’s] guidelines; however, there still appears to be significant variation from these guidelines in Dr. Burney’s case selection.” The panel recommended “that Dr. Burney should have a 100% review of all of his cases per quarter for the next year with the expectation that a significant increase in compliance with these guidelines will be demonstrated during each quarter.”
 
 [25]
 
 The panel also recommended that East Alabama’s Board of Directors should formally adopt the review criteria and notify staff
 
 *1520
 
 physicians that any significant deviation from the criteria could jeopardize staff privileges.
 
 [26]
 

 • The hearing panel’s recommendation was referred to East Alabama’s Board of Directors. All of the Board members were provided with the hearing transcript, exhibits, memoranda of counsel, the hearing panel’s findings, and a statement by Dr. Burney’s attorney on his behalf. The Board’s Quality of Care Committee affirmed the use of the back surgery criteria and stated that a physician’s “failure to substantially comply with these criteria will result in corrective action.”
 
 [27]
 
 The committee also found that Dr. Burney had deviated significantly Jrom these criteria. The Committee did not accept the hearing panel’s recommendation regarding Dr. Burney, but rather confirmed the Medical Executive Committee’s suspension of Dr. Burney’s privileges and recommended that his appointment be terminated.
 
 [28]
 

 • In a meeting on January 26, 1995, East Alabama’s Board of Directors approved the Quality of Care Committee’s recommendation, and Dr. Burney’s staff privileges were terminated.
 
 [29]
 

 • Dr. Burney filed this lawsuit on August 10,1995.
 

 II. DISCUSSION
 

 Dr. Burney’s fraud, misrepresentation, and deceit claims are based on the October 26 letter he received from East Alabama. The theory undergirding his claims is essentially as follows: In its October 18 letter, InterQual informed East Alabama that, although the special review program criteria “will not restrict what the surgeon believes is necessary for the care of his patient, ... a surgeon continues such disavowed practices at his peril for continued medical staff membership.”
 
 [30]
 
 However, East Alabama’s October 26 letter to Dr. Burney did not include the “peril” caution; the letter stated that the criteria would be “simply a guide to allow the medical staff and board to evaluate the efficacy of lamineetomies/spinal fusions at East Alabama,” and that, “If you disagree with an indication for surgery based on the criteria you can still use your judgement to perform surgery.”
 
 [31]
 
 Dr. Burney claims he understood his duty to be only as set forth in the October 26 letter: “to document [his] reasoning in the medical record for [his] decision.”
 
 [32]
 
 Dr. Burney claims that East Alabama fraudulently failed to warn him, to his detriment, that “A surgeon continues such disavowed practices at his peril for continued medical staff membership.”
 
 [33]
 
 He alleges that, if he had known this, he “would not have deviated from the criteria.”
 
 [34]
 
 According to Dr. Burney, “his acting in reliance on the misrepresentations set out in the [October 26] letter of explanation created the underlying basis for [his] suspension.”
 
 [35]
 
 Dr. Burney seeks only damages. He does not seek reinstatement or any other type of injunctive relief.
 
 [36]
 

 A.
 

 The defendants claim that HCQIA immunizes them from damage liability because their actions to suspend and terminate Dr. Burney’s privileges were “professional review actions” under the Act. 42 U.S.C.A §§ 11111(a)(1), 11112(a) (West 1995).
 
 [37]
 
 
 *1521
 
 HCQIA was passed by Congress in 1986 “to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who- engage in unprofessional behavior.” H.R.Rep. No. 903, 99th Cong., 2d Sess., pt. 2 (1986),
 
 reprinted in
 
 1986 U.S.C.C.AN. 6287, 6384. Congressional findings in the text of the Act note that “The threat of private money damage liability under [state and] Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review.”
 
 Bryan v. James E. Holmes Regional Medical Ctr.,
 
 33 F.3d 1318, 1321 (11th Cir.1994) (quoting 42 U.S.C.A. § 11101(4) (West 1995)),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 1363, 131 L.Ed.2d 220 (1995). HCQIA was “designed to facilitate the frank exchange of information among professionals conducting peer review inquiries without the fear of reprisals in civil lawsuits. The statute attempts to balance the chilling effect of litigation on peer review with concerns for protecting physicians improperly subjected to disciplinary action; accordingly, Congress granted immunity from monetary damages to participants in properly conducted peer review proceedings while preserving causes of action for injunctive or declaratory relief for aggrieved physicians.”
 
 Id.
 
 at 1322. Toward this end, “Congress granted immunity from monetary damages to participants in properly conducted peer review proceedings.”
 
 Id.
 

 The term “professional review action” is defined in HCQIA as “an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges ... of the physician.” 42 U.S.C.A § 11151(9) (West 1995). Dr. Burney does not question that the suspension and termination of his staff privileges qualify as “professional review actions.” Nor does he challenge that, in suspending and terminating his privileges, the defendants constituted a “professional review body” within the meaning of the Act.
 
 [38]
 

 Nevertheless, Dr. Burney correctly notes that, in order to qualify for HCQIA’s grant of immunity, the defendants’ “professional review actions” must meet four requirements. The professional review action must be taken
 

 “(1) in the reasonable belief that the action was in the furtherance of quality health care,
 

 (2) after a reasonable effort to obtain the facts of the matter,
 

 (3) after adequate notice and hearing procedure are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
 

 (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).”
 

 42 U.S.C.A § 11112(a) (West 1995). Dr. Burney admits that the second and third requirements have been met.
 
 [39]
 
 He contends that the defendants have failed to meet only the first and fourth requirements: that they acted “in the
 
 reasonable belief ...
 
 that the action was in the furtherance of quality health care, and ... that the action was warranted by the facts known.”
 
 Id.
 
 (emphasis added).
 
 [40]
 

 
 *1522
 
 In determining whether HCQIA’s “reasonable belief’ requirements for immunity have been met, the court is constrained by several important legal principles, some of which are unique to the Act. First, “HCQIA immunity is a question of law for the court to decide and may be resolved whenever the record in a particular case becomes sufficiently developed.”
 
 Bryan,
 
 33 F.3d at 1335.
 

 Second, HCQIA modifies the standard burden of production for a motion for summary judgment. In general, Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where “there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.” Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the nonmoving party to demonstrate why summary judgment would be inappropriate.
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the nonmoving party.
 
 Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
 

 In this instance, however, HCQIA modifies the standard burden of production for a motion for summary judgment by a party requesting immunity for a professional review action. The statute instructs that, “A professional review action shall be presumed to have met the ... standards necessary for protection ... unless the presumption is rebutted by a preponderance of the evidence.” 42 U.S.C.A. § 11112(a) (West 1995). The proper application of HCQIA’s rebuttable presumption was explained by the Eleventh Circuit Court of Appeals in
 
 Bryan.
 
 According to the appellate court, the presumption creates “an unusual summary judgment standard that can best be expressed as follows: ‘Might a reasonable jury, viewing the facts in the best light for the plaintiff, conclude that he has shown, by a preponderance of the evidence, that the defendants’ actions are outside the scope of § 11112(a)?’ If not, the court should grant the defendant’s motion.” 33 F.3d at 1333 (quoting
 
 Austin v. McNamara,
 
 979 F.2d 728, 734 (9th Cir.1992)). Here, therefore, the burden is on Dr. Burney to show that the defendants’ action did not meet HCQIA’s requirements.
 

 Third, HCQIA’s “reasonable belief’ test “ ‘is an objective one, so bad faith [on the part of the decisionmakers] is immaterial.’ ”
 
 Bryan,
 
 33 F.3d at 1335 (quoting
 
 Austin,
 
 979 F.2d at 734). The test therefore is whether “the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients.”
 
 Bryan,
 
 33 F.3d at 1334-35 (quoting H.R.Rep. No. 903, at 10, reprinted in 1986 U.S.C.C.A.N. at 6393). “ ‘The real issue is the sufficiency of the basis for the [Hospital’s] actions.’”
 
 Id.
 
 at 1335 (quoting
 
 Austin,
 
 979 F.2d at 734).
 

 Fourth and finally, because “HCQIA clearly grants broad discretion to hospital boards with regard to staff privileges decisions, ... the role of federal courts ‘on review of such actions is not to substitute [their] judgment for that of the hospital’s governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges.’”
 
 Id.
 
 at 1337 (quoting
 
 Shahawy v. Harrison,
 
 875 F.2d 1529, 1533 (11th Cir.1989)).
 

 B.
 

 With his fraud, misrepresentation, and deceit claims, Dr. Burney is essentially asking this court to do just what HCQIA forbids: “to reweigh the evidence regarding the renewal or termination of medical staff privileges.”
 
 Id.
 
 at 1337 (quoting
 
 Shahawy,
 
 875 F.2d at 1533).
 

 
 *1523
 
 Whether Dr. Burney was misled by the October 26 letter into believing that he could vary from the special review program criteria without risk to his hospital privileges is the very type of issue that should be resolved in the professional review process. InterQual found that Dr. Burney had failed to meet the case selection criteria more often in 1994 than he had before the special review program began — that is, that his “Not indicated” surgeries actually increased. Dr. Burney’s defense — that his failure to meet the criteria was due to a misunderstanding of the constraints placed upon him by the criteria — is an issue he should have presented during the professional review process. He admits that he learned upon his suspension, prior to his due process hearings, that the basis of the hospital’s proposed adverse action was his failure to meet the criteria.
 
 [41]
 
 If he presented this defense to the members of the hospital’s professional review body, then this court cannot review that body’s rejection of the defense’s merit. If he did not present this defense to that body, he should have, for, if the defense has merit, the hospital could very well have given him another chance to prove himself. This court cannot now save him from his own dereliction. As stated, this court is “ ‘not to substitute [its] judgment for that of the hospital’s governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges.’”
 
 Id.
 
 at 1387 (quoting
 
 Shahawy,
 
 875 F.2d at 1533).
 

 C.
 

 Dr. Burney contends that there is “ample evidence of ill motive” to rebut the presumption that the East Alabama’s initial decision to suspend and final decision to terminate Dr. Burney’s staff privileges were prompted by a reasonable belief about the quality of health care.
 
 [42]
 
 He overlooks, however, that HCQIA’s “reasonable belief’ test “ ‘is an objective one, so bad faith [on the part of the decisionmakers] is immaterial.’ ”
 
 Bryan,
 
 33 F.3d at 1335 (quoting
 
 Austin,
 
 979 F.2d. at 734). “ ‘The real issue is the sufficiency of the basis for the [Hospital’s] actions.’ ”
 
 Id.
 
 at 1335 (quoting
 
 Austin,
 
 979 F.2d at 734). There was, without question, sufficient evidence to support the hospital’s decision to suspend, and later terminate, Dr. Burney’s staff privileges. Indeed, Dr. Burney admits that he “is not seeking to re-litigate his termination.”
 
 [43]
 
 Therefore, the evidence he has submitted to the court of ill motive — for example, that he had retired in June 1994, and that that fact was known by East Alabama before it made the ultimate decision to terminate his hospital privileges,
 
 [44]
 
 and that he has had only one malpractice claim filed against him in his entire career — is immaterial.
 
 [45]
 

 D.
 

 Finally, Dr. Burney emphasizes that his challenge to the defendants’ entitlement to immunity is based on the fact that he is challenging the October 26 letter and not the defendants’ decision to suspend and termi
 
 *1524
 
 nate his hospital privileges. He contends that the letter is not a “professional review action” within the purview of HCQIA and thus that the defendants are not entitled to immunity from damages for the letter.
 

 Admittedly, not everything that might conceivably lead to the suspension or termination of a physician’s staff privileges is, or should be, protected activity under HCQIA. For example, if a co-worker were to brutally attack a surgeon and the hospital were then to terminate the surgeon’s staff privileges because his injuries had left him physically and emotionally unfit to practice medicine, HCQIA would not provide immunity from damages to the co-worker. In that instance, the physical assault would not be part of the professional review process. However, the same cannot be said about the October 26 letter.
 

 Under HCQIA, as stated, an individual or decisionmaking body is immune from damage liability for claims arising out of its “professional review action” that meets § 11112(a)’s four requirements. 42 U.S.C.A. § 11111(a)(1) (West 1995). The Act draws a distinction between “professional review ac
 
 tion
 
 ” and “professional review
 
 activity.”
 
 A “professional review
 
 action”
 
 is, as stated, “an action or recommendation of a professional review body which is taken or made in the conduct of professional review
 
 activity.”
 
 42 U.S.C.A § 11151(9) (West 1995) (emphasis added). The term “also includes professional review
 
 activities relating
 
 to a professional review
 
 action.” Id.
 
 (emphasis added). “Professional review
 
 activity”
 
 includes “an activity
 
 ... to determine
 
 whether the physician may have clinical privileges.” 42 U.S.C.A. § 11151(10) (West 1995) (emphasis added).
 
 [46]
 

 Other courts, faced with the question of what constitutes a “professional review
 
 activity,”
 
 have correctly interpreted the term to include preliminary investigations and fact-findings that would lead to a “professional review
 
 action.” See Mathews v. Lancaster General Hospital,
 
 87 F.3d 624, 634 (3rd Cir.1996) (“the term ‘professional review activity’ refers to preliminary investigative measures taken in a ‘reasonable effort to obtain the facts’ relevant to a possible change in a physician’s privileges”);
 
 Austin,
 
 979 F.2d at 736-37 (the reasonable effort to obtain the facts, “when expended for the purpose of determining a change in a physician’s clinical privileges, constitutes ‘professional review activity5 ”);
 
 Fobbs v. Holy Cross Health Sys. Corp.,
 
 789 F.Supp. 1054, 1065 (E.D.Cal.1992) (“professional review activity means the . investigative process during and/or upon which a professional review action ... is made”),
 
 affd,
 
 29 F.3d 1439 (9th Cir.1994),
 
 cert. denied,
 
 - U.S. -, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995).
 

 However, the question still remains as to whether an investigation, though a professional review activity, is protected conduct under HCQIA. Section 11112(a) requires that, in order to be protected conduct, the professional review action must be based on a “reasonable belief’ made “after a
 
 reasonable
 
 effort to obtain the facts of the matter,” 42 U.S.C.A. § 11112(a) (emphasis added) — in other words, after a reasonable investigation. Because this section requires, as an element necessary for immunity, that there be an investigation, it would not follow that the investigation (the professional review activity) would be expected to meet § 11112(a)’s four requirements. An investigation, standing alone, could not constitute protected conduct.
 

 A preliminary investigation could, and should, qualify as protected conduct, however, if it is part of a professional review action that meets § 11112(a)’s four requirements. This reading of HCQIA is supported by both the Act’s legislative history and the Congressional findings in the text of the Act. As
 
 *1525
 
 stated, HCQIA was passed by Congress in 1986 “to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior.” H.R.Rep. No. 903, 99th Cong., 2d Sess., pt. 2 (1986),
 
 reprinted in
 
 1986 U.S.C.C.A.N. 6287, 6384. Congressional findings in the text of the Act note that “The threat of private money damage liability under [state and] Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review.”
 
 Bryan,
 
 33 F.3d at 1321 (quoting 42 U.S.C.A. § 11101(4) (West 1995)). HCQIA was therefore “designed to facilitate the frank exchange of information among professionals conducting peer review inquiries
 
 without the fear of reprisals in civil lawsuits.” Id.
 
 at 1322 (emphasis added).
 

 In light of this purpose, it would have been an empty gesture to hold immune from damages a peer review committee’s ultimate decision about a physician’s staff privileges but not the steps reasonably taken by the members to reach that decision. Without an expansive reading of HCQIA’s reach, those engaging in peer review would still have to “fear [monetary] reprisals in civil lawsuits,”
 
 id.,
 
 for a complaining physician could merely challenge each of the steps taken to reach that decision. Those engaging in peer review would still face substantial damage liability, if not the same damage liability that would have attached in the absence of the Act. The whole cannot be protected without protecting its parts as well.
 

 This reading also follows from the structure of HCQIA itself. Under § 11111(a)(1), a professional review action is eligible for protection from damages. Under § 11151(9), a professional review activity that is “related” to a professional review action is included within the definition of professional review action, and, thus, under § 11112(a), is also eligible for immunity. It therefore follows that, if an investigation is a professional review activity and if it is “related” to a professional review action it should be eligible for immunity as well. More importantly though, a professional review action is protected only if, among other requirements, it is a product of a “reasonable effort to obtain the facts of the matter,” 42 U.S.C.A. § 11112(a) (West 1995), that is, it is a product of a “reasonable” investigation. A “reasonable” investigation is thus an essential requirement for a professional review action to be immune from damages; or, to put it another way, a protected decision encompasses the steps taken to reach it. Under HCQIA, therefore, it would be illogical and impractical to separate a protected decision from the steps taken to reach that decision, for whether the decision is protected depends on the steps taken to reach it.
 

 However, no court has yet attempted to determine exactly what types of activities should be considered part of the investigative process and thus eligible for immunity. Dr. Burney argues that the October 26 letter was not strictly designed for fact-finding and therefore is not eligible for immunity. Dr. Burney’s definition of professional review activity is too narrow and adopting his interpretation of the term would subvert HCQIA’s very purpose. Communication between the target and those conducting the peer reviews is critical to the interest of-both the target and the hospital. Obviously, an administrative investigation would routinely involve providing notice to the target and exchanging or soliciting information. However, where, as is typical in peer review, the investigation is prospective as well as retrospective, it is necessary to provide to the target a description of relevant policies or procedures that will govern the conduct that is subject to prospective review. Therefore, if an investigation is to be reasonable and thus reliable, it should include as one of its essential elements the communication of all necessary information to the target. Denying immunity for communication would inhibit a reviewing body’s willingness to engage freely and openly in such communication. It would thus reduce the amount of information provided to a physician under investigation and would limit his ability not only to prepare an adequate defense but to provide cooperation or additional information at an early stage of review, before the due process requirements of HCQIA go into effect.
 

 
 *1526
 
 Of course, having concluded that a communication to a physician could be considered part of a hospital’s investigation of that physician and thus part of its professional review action, the court still has before it the question of whether the October 26 letter is the type of communication that should be entitled to immunity under HCQIA. As stated above, under § 11151(9), a professional review activity, including an investigation, is considered part of a professional review action only if it is “related” to a professional review action. It is obvious that the October 26 letter was related to the professional review action at issue. The letter was sent after East Alabama’s special review program had begun to look into Dr. Burney’s surgical case selections. It was sent in response to Dr. Burney’s criticism of East Alabama’s review criteria, it elicited further information from Dr. Burney, and it explained the procedures for prospective review.
 

 More importantly here, under § 11112(a), a professional review action is protected only if, among other requirements, it is a product of a “reasonable effort to obtain the facts of the matter.” 42 U.S.C.A. §§ 11112(a) (West 1995). Therefore, as stated, the investigation must also be “reasonable.” In this instance, where the investigation includes both prospective and retrospective conduct, the investigation must be reasonable not only in the sense that it should be thorough but also in the sense that it should be fair. It would be unfair, and thus not reasonable, to subject a physician to prospective review under a set of rules different from those he was told that would govern his future conduct.
 

 Admittedly, Dr. Burney claims that this is exactly what happened to him as a result of the October 26 letter. However, the October 26 letter should not be considered in isolation but in the context of all the procedures and circumstances that attended Dr. Burney’s peer review. In addition, as stated, the court’s consideration of this matter should be “ ‘an objective one ... [and] bad faith [on the part of the decisionmakers] is immaterial.’ ”
 
 Bryan,
 
 33 F.3d at 1335 (quoting
 
 Austin,
 
 979 F.2d at 734); the court should not “ ‘reweigh the evidence regarding the renewal or termination of medical staff privileges.’ ”
 
 Id.
 
 at 1337 (quoting
 
 Shahawy,
 
 875 F.2d at 1533).
 

 Cast against these principles and in the light of all circumstances, the October 26 letter was not unreasonable. As stated, Dr. Burney was given a full and fair opportunity to bring to the attention of the defendants any belief he may have had that the October 26 letter misled him. If those conducting the peer review disbelieved Dr. Burney, then this court is not in a position to second-guess that decision. If Dr. Burney failed to bring this matter to the attention of his reviewing peers, then the fault lies with him. The bottom line is that, if the letter was misleading, the defendants provided Dr. Burney with a full and fair opportunity to seek redress for that error. The defendants are immune from damages for the October 26 letter.
 
 [47]
 

 E.
 

 The defendants further assert that Dr. Burney’s claims are barred because he failed to exhaust administrative remedies available to him at East Alabama. Because the defendants are immune from liability for damages under HCQIA, and Dr. Burney did not request any injunctive or declaratory relief, the court need not reach this issue.
 

 An appropriate judgment will be entered.
 

 
 *1527
 

 ORDER ON RECONSIDERATION
 

 This lawsuit is before the court again, this time on a motion for reconsideration filed by plaintiff Robert E. Burney, M.D. In his motion, Dr. Burney states that his
 

 “claim is based on the fraud related to the October 26 letter and his reliance thereon. Once Dr. Burney acted in reliance upon the fraud that set in motion the chain of events that subjected Dr. Burney to the hearing process. Whether or not the hearing’s panel or the executive committee reinstated Dr. Burney is inconsequential as to the issue of liability on his fraud claim.”
 

 Again, Dr. Burney attempts to separate the October 26 letter from the termination of his staff privileges. The letter cannot, however, be viewed in a vacuum, separate from Dr. Burney’s termination and the events that led to it. Whether the letter was false, whether Dr. Burney reasonably relied on the letter’s representations, and whether he suffered any damages as a result of the letter, are all issues that ultimately depend on the propriety of the termination of his staff privileges.
 

 Before closing, it must be emphasized again that this court has
 
 not
 
 determined, one way or the other, whether the October 26 letter was, in fact, fraudulent. Dr. Burney may be correct, and it could very well be that the October 26 letter
 
 was
 
 intended to mislead him and that he
 
 was,
 
 in fact, misled by the letter. However, to redress this wrong and others, while at the same time still “facilitat[ing] the frank exchange of information among professionals conducting peer review inquiries,”
 
 Bryan v. James E. Holmes Regional Medical Ctr.,
 
 33 F.3d 1318, 1322 (11th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 1363, 131 L.Ed.2d 220 (1995), Congress made a trade off. On the one hand, it “preserv[ed] causes of action for injunctive or declaratory relief for aggrieved physicians.”
 
 Id.
 
 And, on the other hand, to “facilitate the frank exchange of information,” it “granted immunity from monetary damages to participants in properly conducted peer review proceedings.”
 
 Id.
 
 Therefore, if Dr. Burney had sought injunctive or declaratory relief and if, in support of this relief, he had then been able to show that the October 26 letter was intended to, and did, mislead him, this court would have been ready and willing to provide appropriate injunctive or declaratory relief to him as an “aggrieved physician.” The problem is that Dr. Burney wanted only damages and did not want the relief Congress made available to him.
 

 It is therefore ORDERED that the motion for reconsideration filed by plaintiff Robert E. Burney on September 11, 1996, is denied.
 

 [1]
 

 . Plaintiff's brief, filed on March 25, 1996, Burney Aff. at 2.
 

 [2]
 

 .
 
 Id.
 

 [3]
 

 .
 
 Id.
 
 at 3.
 

 [4]
 

 .
 
 Id.
 

 [5]
 

 . Defendants’ motion for summary judgment, filed on January 16, 1996, Baker Aff. at 1-2.
 

 [6]
 

 .
 
 Id.
 
 at 3.
 

 [7]
 

 .
 
 Id. See also id.,
 
 Exh. E.
 

 [8]
 

 .
 
 Id.,
 
 Baker Aff. at 3-4.
 

 [9]
 

 .
 
 Id.
 
 at 4.
 

 [10]
 

 .
 
 Id.,
 
 Exh. G.
 

 [11]
 

 .
 
 Id.,
 
 Exh. H.
 

 [12]
 

 .
 
 Id.,
 
 Baker Aff. at 6.
 

 [13]
 

 .
 
 Id.,
 
 at Exh. M.
 

 [14]
 

 .
 
 Id,,
 
 Exh. N.
 

 [15]
 

 .
 
 Id.,
 
 Exh. Nl. The letter stated, in part:
 

 "Guidelines are designed to send the strongest signals, to surgeons performing the covered spinal procedures, that the Hospital will now carefully analyze this elaborate practice style, seeking evidence that it is truly indicated and necessary. Appropriate interventions will not be faulted. Dr. Fager and I provided full explanations to Drs. Ranier and Burney [in a meeting on August 18] that the Guidelines are not proscriptive. A surgeon may document why a different practice is (a) appropriate to his patient’s needs, and (b) will provide benefit that outweighs risk, and (c) has demonstrated and professionally accepted effectiveness____ "In sum, these Guidelines will not restrict what the surgeon believes is necessary for the care of his patient. But a hospital can chose [sic] to refuse permission for procedures it deems inappropriate. A surgeon continues such disavowed practices at his peril for continued medical staff membership.”
 

 Id.
 

 [16]
 

 .
 
 Id.,
 
 Exh. O. The October 26 letter stated, in part:
 

 "Thank you for your letter of October 12,1993 regarding criteria for back surgery____ Your letter seeks a delay in the implementation of this review process. We do not agree to this delay____ We appreciate your comments on the criteria and will forward such to InterQual for consideration to improve the criteria. We encourage you to add any other suggestions you might have so that we can improve this criteria.
 

 The criteria is simply a guide to allow the medical staff and board to evaluate the efficacy of lamineetomies/spinal fusions at East Ala
 
 *1519
 
 bama. You as a clinician will make the decision for surgery. If you disagree with an indication for surgery based on the criteria you can still use your judgement to perform surgery. It will be incumbent on you to document your reasoning in the medical record for your decision.
 

 In summary, the criteria distributed to you is now in effect and all laminectomies/spinal fusions after October 15, 1993 will be assessed against this criteria. We will keep you informed of your review results and welcome your comments to improve the criteria.”
 

 Id.
 

 [17]
 

 .
 
 Id.,
 
 Exh. Q.
 

 [18]
 

 . Plaintiff's brief, filed on March 25, 1996, Burney Aff. at 3.
 

 [19]
 

 . Defendants’ supplemental affidavit, filed on April 12, 1996, at 1-2 & Exh. D.
 

 [20]
 

 . Plaintiff's brief, filed on March 25, 1996, Burney Aff. at 5.
 

 [21]
 

 . Defendants’ motion for summary judgment, filed on January 16, 1996, Exh. S.
 

 [22]
 

 .
 
 Id.
 

 [23]
 

 . Plaintiff's brief, filed on March 25, 1996, at 6, 12.
 

 [24]
 

 . Defendants’ motion for summary judgment, filed on January 16, 1996, Exh. U.
 

 [25]
 

 .
 
 Id.,
 
 Exh. LL.
 

 [26]
 

 .
 
 Id.
 

 [27]
 

 .
 
 Id.,
 
 Exh. TT.
 

 [28]
 

 .
 
 Id.
 

 [29]
 

 .
 
 Id.,
 
 Exh. UU.
 

 [30]
 

 .
 
 Id.,
 
 Exh. Nl.
 

 [31]
 

 .
 
 Id.,
 
 Exh. O.
 

 [32]
 

 .
 
 Id.
 

 [33]
 

 .
 
 Id.,
 
 Exh. Nl.
 

 [34]
 

 . Plaintiff's brief, filed on March 25, 1996, at 15.
 

 [35]
 

 .
 
 Id.
 
 at 7.
 

 [36]
 

 .
 
 See infra
 
 note 40.
 

 [37]
 

 . Specifically,! 11111(a)(1) provides:
 

 "If a professional review action ... of a professional review body meets all the standards specified ... (A) the professional review body, (B) any person acting as a member or staff to the body, (C) any person under a contract or other formal agreement with the body, and (D) any person who participates with or assists the
 
 *1521
 
 body with respect to the action, shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.”
 

 42 U.S.C.A. § 11111(a)(1) (West 1995).
 

 [38]
 

 . A "professional review body” is defined as “a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity.” 42 U.S.C.A. § 11151(11) (West 1995).
 
 See infra
 
 note 40.
 

 [39]
 

 . Plaintiff's brief, filed on March 25, 1996, at 9-10.
 

 [40]
 

 .
 
 Id.
 
 In his brief, Dr. Burney states that "The Plaintiff is not challenging the authority of [East Alabama] to adopt criteria. The Plaintiff is not challenging whether the criteria is [sic] good or bad medicine. The Plaintiff is not challenging the authority of [the hospital] to impose the crite
 
 *1522
 
 ria on him. The Plaintiff is not challenging the procedural due process of the disciplinary proceedings. The Plaintiff is not seeking a reinstatement of privileges at [the hospital] and is not seeking to re-litigate his termination.”
 
 Id.
 
 at 8. He further states that "Plaintiff does not contest that a reasonable effort was expended in obtaining facts, nor does he directly attack the procedures that he was afforded.”
 
 Id.
 
 at 9.
 

 [41]
 

 . Plaintiff’s brief, filed on March 25, 1996, at 6, 12.
 

 [42]
 

 .
 
 Id.
 
 at 10.
 

 [43]
 

 .
 
 See supra
 
 note 40.
 

 [44]
 

 . In any event, Dr. Burney has provided no evidence that his announced retirement would ensure that he never perforated another unindicated surgery. He maintained his hospital privileges until the time of his suspension and does not allege that he informed East Alabama that he was resigning. Certainly, the hospital could have believed that his retirement was reversible or partial. Under these circumstances, the fact of his retirement does not rebut the presumption that the professional review action was taken in the reasonable belief that the action was in furtherance of quality health care.
 

 [45]
 

 . Dr. Burney concedes, however, that his malpractice record cannot disprove the reasonable belief of the defendants that their action was in furtherance of quality health care. First, there is no evidence that the number of malpractice claims filed against a physician indicates his or her competence. Second, his malpractice record only reflects his past actions and has little bearing on his present or future competence. Third, East Alabama’s concern with Dr. Burney related to his performance of unnecessary or unindicated surgery, not with his competence in performing the surgeries. Patients are in a worse position to evaluate the necessity of a surgical procedure than they are to evaluate a bad or unexpected result of surgery. For all of these reasons, Dr. Burney's malpractice record is a poor proxy for his competence in surgical case selection.
 

 [46]
 

 . The term "professional review activity” is defined as:
 

 “an activity of a health care entity with respect to an individual physician—
 

 (A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,
 

 (B) to determine the scope or conditions of such privileges or membership, or (C) to change or modify such privileges or membership.”
 

 42 U.S.C.A. § 11151(10) (West 1995).
 

 [47]
 

 . It should be noted, albeit only as a side issue, that the defendants state — and apparently Dr. Burney does not contest — that Dr. Burney failed to raise, during the entire peer review process, his contention that the October 26 letter misled him, even though the letter was an issue in the process. Defendants' motion for summary judgment, filed on January 16, 1996, Baker Aff. at 20. The serious question is therefore posed as to why Dr. Burney — who learned as early as his initial suspension that his failure to comply with the criteria would be the basis for any final action,
 
 see infra
 
 note 41, and who is not in any way shy about making his views known and asserting his rights — would remain silent on this issue, unless, of course, he was not misled by the letter. A strong case could be made, on the current record, that the defendants would be entitled to summary judgment even in the absence of their immunity defense. However, because summary judgment on the merits was not asserted by the defendants, the court will not, and should not, address it.