764 So.2d 295 (2000)
Dr. Ismael MANASRA, Plaintiff-Appellant,
v.
ST. FRANCIS MEDICAL CENTER, INC., et al., Defendants-Appellees.
No. 33,312-CA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 2000.
*297 Theus, Grisham, Davis & Leigh by J. Michael Hart, Paul D. Spillers, Monroe, Counsel for Appellant.
Hayes, Harkey, Smith & Cascio by Thomas M. Hayes, III, Monroe, Counsel for Appellees, St. Francis Medical Center, Dr. Gordon D. Gates and E. Gerald Smith.
Lance P. Havener, Shreveport, Counsel for Appellee, Dr. Marc deSoler.
Kearney & Christovich by Kevin R. Tully, Terry Christovich Gay, New Orleans, Counsel for Appellee, Federal Ins. Co.
Pugh, Boudreaux & Shelton by William E. Bourgeois, Monroe, Counsel for Appellee, St. Paul Fire & Marine Ins. Co.
Before STEWART, GASKINS and KOSTELKA, JJ.
STEWART, J.
Dr. Ismael Manasra, a neonatologist, filed suit for damages after the termination of his staff privileges at St. Francis Medical Center ("SFMC") in Monroe, Louisiana due to an ongoing pattern of disruptive behavior. The defendants include SFMC; Dr. H. Gordon Gates ("Dr.Gates"), SFMC's Chief of Staff; Mr. H. Gerald Smith ("Mr.Smith"), SFMC's chief executive officer; and Dr. Marc deSoler ("Dr.de-Soler"), a neonatologist. The trial court granted motions for summary judgment filed by the defendants and dismissed all of the plaintiff's claims against them. Dr. Manasra appeals the dismissal of his claims. We affirm.

FACTS
In 1989, Dr. Manasra and Dr. deSoler became co-directors of SFMC's neonatal intensive care unit (hereinafter "NICU"). Through their corporation, Northeast Louisiana Neonatology Group, Dr. Manasra and Dr. deSoler contracted with SFMC to provide medical and administrative services for the NICU.
Soon after Dr. Manasra began to practice medicine at SFMC, complaints began to surface about his behavior. Notice of these complaints was provided to Dr. Manasra by Sister Anne Marie Twohig, the Chief Executive Officer of SFMC at the time, in a letter dated December 7, 1989. The letter referred to a discussion during which Dr. Manasra denied inappropriate behavior, attributed the reported problems to cultural differences, and averred that his intent had been misrepresented by the nurses. According to the letter, Dr. Manasra agreed to refrain from joking with staff on sexual matters. He was advised *298 to refrain from discussing personal affairs and kissing or touching nurses in ways that might be construed as sexual advances. The letter warned Dr. Manasra that further complaints would result in a referral to the Medical Executive Committee ("MEC") for corrective action.
Additional complaints surfaced in 1991. Documented complaints of verbal abuse alleged that Dr. Manasra referred to nurses as "bitches" and called them "stupid" and "lazy," threatened the loss of their jobs, yelled, and used obscenities. There were more allegations of sexual harassment, including inappropriate touching and comments of a sexual nature. Particularly troubling allegations pertained to Dr. Manasra's refusal to listen to certain nurses and respond to their questions. Another troubling incident involved the assault of a respiratory therapist whom Dr. Manasra either pushed or raised his hand in an effort to strike her.
Due to these complaints, Dr. Manasra's clinical privileges were summarily suspended effective upon his receipt of written notice on November 21, 1991. The notice, which referred to the incident of assault against a hospital employee and the reports of disruptive and abusive behavior, stated that Dr. Manasra's conduct had "seriously compromised" patient care and hospital operations. On December 2, 1991, after providing written notice to Dr. Manasra, a committee of doctors met with him to review the complaints and allow him the opportunity to respond. The result of this meeting was that Dr. Manasra agreed to seek psychological and cultural counseling, to continue treatment for high blood pressure and ulcers, and to refrain from verbal or physical abuse and behavior that might be interpreted as sexual harassment. The summary suspension was lifted on December 5, 1991. Dr. Manasra was advised in writing that further substantiated complaints would be considered cause for corrective action.
Similar complaints surfaced in 1992. In an effort to again address the ongoing problem of Dr. Manasra's behavior, Dr. Gates, who was then SFMC's Chief of Staff, met with Dr. Manasra on January 4, 1993, at which time Dr. Manasra agreed to discontinue the objectionable behavior. Dr. Manasra received a written confirmation of their discussion from Dr. Gates after their meeting. Again, Dr. Manasra was warned that disciplinary action would be warranted if problems continued.
Problems escalated and came to a head in August 1993. There were reports of Dr. Manasra's abusive and demeaning treatment of a social worker assigned to the NICU. There were also reports of communication problems with the nursing staff. It was alleged that Dr. Manasra would give verbal orders and later deny doing so. Other complaints pertained to Dr. Manasra's unwillingness to listen to certain nurses when they attempted to report changes in their infant patients' conditions. Another complaint alleged that Dr. Manasra made offensive racial remarks to an NICU employee. Complaints by patients' families regarding Dr. Manasra's behavior also surfaced.
On August 16, 1993, Dr. deSoler and Theresa Marsala, the senior vice-president of patient care services, met with Dr. Manasra to discuss his inappropriate behavior. According to a memorandum of this meeting, which appears to bear Dr. Manasra's signature, Dr. Manasra understood that his behavior was unacceptable and disruptive and that it must change. The memorandum stated that there was to be no cursing, shouting or screaming at employees and no inappropriate jokes or comments. Also, Dr. Manasra was directed to leave the NICU and contact Delores Wood, the nursing director of the NICU, whenever he became upset. Staff meetings were planned to address the ongoing problems caused by Dr. Manasra' behavior and to define and clarify job responsibilities. Dr. Manasra met with NICU staff, including nurses and respiratory therapists, on August 17, 18, and 19. According to the memoranda from these meetings, *299 concerns of both Dr. Manasra and the staff were discussed. Dr. Manasra indicated that there would be a "new Dr. Manasra," and he discussed his childhood to enable the staff to understand his culture. It was revealed that negative things may have been said about Dr. Manasra and Dr. de-Soler by an NICU educator during staff orientations. Finally, it was decided that Delores Wood would develop an action plan to delineate the duties and responsibilities of NICU staff so as to avoid problems that might have stemmed from confusion regarding job responsibilities in the NICU.
Dr. Manasra met with Mr. Smith and Dr. Gates as indicated in a letter dated August 17, 1993 from Dr. Gates to Dr. Manasra. According to this letter, Dr. Manasra expressed determination to control his self-described "terrible temper" and set forth a plan for doing so. Psychiatric counseling was suggested as a means to assist Dr. Manasra in controlling his behavior; however, he rejected the suggestion. In a memorandum dated August 20, 1993, Theresa Marsala wrote that she met with Dr. Manasra following the staff meetings. According to Marsala, Dr. Manasra was "extremely angry and loud," expressed dislike for Dr. Gates and Mr. Smith, stated that they needed to be punished, and threatened that he would "get even" and "break their faces." Marsala reported these threatening comments to Dr. Gates.
Despite the efforts made to address Dr. Manasra's disruptive behavior, problems continued. A patient's family complained that Dr. Manasra "flew into a rage" during a discussion with a patient's mother. Stress within the unit increased. Delores Wood reported that nurses were complaining of physical symptoms, such as headaches, nausea and vomiting, and were seeking part-time status. On September 7, 1993, Dr. Manasra prepared a written complaint addressed to Theresa Marsala in which he recounted his version of incidents that occurred with nurses in the NICU.
Due to the continuation of complaints about Dr. Manasra's behavior, the MEC met on September 8, 1993 to address the ongoing problems in the NICU. The MEC decided to implement the disciplinary process provided in SFMC's Medical Staff Rules and Regulations by forming an ad hoc committee of doctors to review the situation. Dr. Russell Bulloch, the Chairman of the Department of Pediatrics, agreed to interview Dr. Manasra. Dr. Manasra received written notice of the MEC's decision on September 10, 1993 and was advised to review the Medical Staff Rules and Regulations. Dr. Bulloch met with Dr. Manasra on September 13, 1993, and recounted their meeting in a memorandum. The memorandum states that Dr. Manasra related details of his upbringing in Jordan. Dr. Bulloch believed that many of the current problems stemmed from exhaustion and stress. Both Dr. Bulloch and Dr. J. Rahn Sherman, a psychiatrist familiar with the situation, believed that Dr. Manasra was capable of discharging his duties as a neonatologist.
On September 15, 1993, Dr. Manasra received written notice from Dr. Gates of an MEC meeting scheduled for September 28. Dr. Manasra was invited to appear for a twenty-minute period and to submit a written report for the MEC to review. On September 16, 1993, Dr. Manasra made a written request for the specific complaints about his behavior. In a letter dated September 20, 1993, Dr. Gates expressed surprise at Dr. Manasra's request considering the numerous meetings about his behavior that had occurred; but in response to the request, he referred to ongoing complaints of "frequent emotional outbursts ... laced with loudly delivered profanity and obscenity." Dr. Gates also noted that Dr. Manasra had previously acknowledged his inappropriate behavior. Finally, Dr. Gates explained that since the summer, there had been "repeated reports of severe deterioration in your treatment of the NICU staff characterized by erratic swings in your behavior ranging from friendliness at *300 one time to sudden scathing attacks soon after" resulting in a atmosphere of "intimidation and fear." Dr. Manasra was subsequently advised by letter dated September 23, 1993, that he could ask a member of the medical staff to appear as his advocate at the MEC meeting.
During the course of the disciplinary process, more complaints surfaced. Of particular concern were reports of Dr. Manasra's possible refusal to timely address information from NICU nurses about two infant patients with deteriorating conditions. At least one of these patients died. Complaints alleged that Dr. Manasra refused to communicate with certain nurses and that these nurses were forced to work around the situation in order to obtain orders for their patients.
On September 28, 1993, the MEC met. According to the MEC's minutes, Dr. Manasra attended a portion of the meeting with Dr. Sherman as his advocate. The MEC reviewed the numerous complaints, including the recent allegation that Dr. Manasra's refusal to communicate with certain nurses may have compromised the care of an infant resulting in a death. Dr. Gates discussed this last complaint in the presence of Drs. Manasra and Sherman. Dr. Manasra reported that two infants had died over the weekend. The minutes show that Dr. Manasra accused some of the nursing staff of discrimination against parents of different ethnic, racial, and social backgrounds. He also explained that the alleged threats against Dr. Gates and others were taken out of context and that it was inborn in him to over express his feelings. Similarly, Dr. Sherman opined that some of Dr. Manasra's behavior was the result of both learned behavior during his childhood and cultural differences. The minutes further show that the MEC did not accept the excuse of cultural differences put forth by Dr. Manasra and Dr. Sherman since Dr. Manasra had been in the United States for over 13 years. The MEC voted unanimously to place Dr. Manasra on summary suspension and to recommend revocation of his medical staff membership to SFMC's Board of Directors. Dr. Bulloch, who had previously prepared a report favorable to Dr. Manasra, was a member of the MEC.
On September 29, 1993, Dr. Manasra received written notice from Mr. Smith of the MEC's decision. Dr. Manasra was informed that his disruptive behavior was the grounds for the suspension and that the MEC believed that immediate action was required to "reduce the substantial likelihood of immediate injury or damage to the health or safety of patients, employees and/or other persons present in the hospital." Dr. Manasra was also informed that he had thirty days to request a hearing before an Ad Hoc Professional Review Committee (hereinafter referred to as a "peer review committee") and that he would have the right to call witnesses, cross-examine witnesses, and be represented by an attorney.
Dr. Manasra obtained legal counsel and requested a hearing, which was scheduled for November 15, 1993. Judge David Williams, a retired appellate court judge, was chosen as the hearing officer. On October 26, 1993, SFMC gave Dr. Manasra a list of potential witnesses and the names of four patients whose charts would possibly be considered at the hearing. After the hearing date was continued at Dr. Manasra's request, the parties met with Judge Williams and selected Saturday, December 11, 1993 as the hearing date. On November 19, 1993, SFMC gave Dr. Manasra a shortened witness list, descriptions of the expected testimony, and copies of most of the documents to be submitted at the hearing. He was informed that additional evidence, including a written chart review and the chart, would be provided when the review arrived. SFMC also agreed to provide copies of written statements obtained from witnesses who would be unable to attend the hearing.
On November 30, 1993, Dr. Manasra's counsel, J. Michael Hart, informed Judge Williams of a conflict in his schedule, *301 namely a jury trial scheduled for Monday, December 13, 1993. Thereafter, on December 7, 1993, the parties faxed a series of letters pertaining to complaints by Dr. Manasra's counsel about the scheduled hearing. Mr. Hart's position was that he lacked sufficient time to digest the documentation provided by SFMC and to prepare a defense, that the issues to be addressed at the hearing had not been sufficiently delineated, and that he had a conflict due to a jury trial scheduled for December 13. Mr. Hart wrote that neither he nor Dr. Manasra would attend the hearing, and he requested copies of the hearing transcript, any evidence presented, and the ruling. In his responses, Judge Williams wrote that a continuance would not be possible and that every effort had been made to accommodate Dr. Manasra and serve the interests of justice by continuing the original hearing date. In a letter to SFMC's attorney dated December 10, 1993, Mr. Hart asserted that Dr. Manasra's failure to appear at the hearing would not constitute a waiver of his rights and that it would be a violation of due process to go on with the hearing without Dr. Manasra's presence. Mr. Hart reiterated his jury trial conflict and his concerns over the scope of the hearing. A copy of this letter was delivered to Judge Williams and the members of the peer review committee.[1]
On December 11, 1993, the hearing went on as scheduled without the presence of Dr. Manasra or his counsel. Those present at the hearing in addition to the committee members and the hearing officer included Ms. Mintz, Mr. Smith, and Dr. Gates. Testimony was heard from Dr. Gates, Mr. Smith, Dr. deSoler, Theresa Marsala, Delores Wood, Monroe Parker (phlebotomy supervisor), Shannon Pearcy (Dr. Manasra's secretary), Debra Lemoine (a nurse), and Sarah Mills (a respiratory therapist). The witnesses recounted their experiences with Dr. Manasra and answered questions posed by the committee members, Ms. Mintz, and the hearing officer. The committee members, through their questions, explored whether sufficient steps had been taken to address the problems in the NICU, whether the ongoing problems could be attributed to the nursing staff, whether the problems could be alleviated by granting Dr. Manasra more authority over NICU staff, and whether Dr. Manasra's behavior could be attributed to cultural differences.
In a written ruling, the peer review committee voted in favor of the MEC's recommendation regarding the suspension and revocation of Dr. Manasra's privileges. Thereafter, the MEC approved the report of the peer review committee and forwarded it to SFMC's Board of Directors for final approval. Dr. Manasra received written notice of the peer review decision on January 5, 1994 and was informed that he could provide a written statement or other documentation for the Board of Directors to consider. Dr. Manasra did not take this opportunity. He received written notice on January 27, 1994 of the Board's approval of the recommendation for revocation of his staff membership and clinical privileges at SFMC effective immediately.
On September 28, 1994, Dr. Manasra filed the instant suit for damages. In his original and amended petitions, he alleged claims based on breach of contract, due process, intentional interference with contractual relations, conspiracy, and unfair trade practices. The defendants filed motions for summary judgment on the basis of the immunity provided in the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101 et seq., and La. R.S. 13:3715.3. In response, Dr. Manasra filed a "Fifth Amended Petition" on February 11, 1998, alleging that his staff privileges were terminated because of national *302 origin discrimination. The defendants, believing that Dr. Manasra stated a claim for relief under the federal civil rights laws, removed the case to federal court. On Dr. Manasra's motion, the matter was remanded to state court upon finding that there was no basis for an exercise of federal question jurisdiction.[2] On July 6, 1999, the trial court granted the defendants' motions for summary judgment on the basis of the HCQIA immunity. The trial court also determined that, in light of the facts alleged, there was no basis for Dr. Manasra's national origin discrimination claim.

DISCUSSION

HCQIA Immunity
HCQIA provides a qualified immunity for professional review actions which meet certain statutory standards. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 (La.7/5/94), 639 So.2d 730. The immunity does not apply to damages under either federal or state law relating to the civil rights of any person. 42 U.S.C. § 11111(1). As such, HCQIA immunity would not bar Dr. Manasra's discrimination claim, but would insulate the defendants from the other claims for damages asserted by him.
If the professional review action meets the applicable standards, then neither the professional review body, any person acting as a member or staff to the body, any person under a contract or other formal agreement with the body, or any person who participates with or assists the body with respect to the action shall be liable in damages with respect to the action taken by the review body. 42 U.S.C. § 11111(1); Rogers v. Columbia/HCA Of Central Louisiana, Inc. et al., 971 F.Supp. 229 (W.D.La.1997). No person, whether a witness or otherwise, who provides information to the professional review body regarding the competence or professional conduct of a physician shall be liable in damages by reason of having provided such information, unless the information is false and the person providing it knew it was false. 42 U.S.C. § 11111(2). The term "professional review body" includes a health care entity and its governing body or any committee which conducts professional review activities and any committee of its medical staff when assisting the governing body in a professional review activity. 42 U.S.C. § 11151(11). Under these provisions, the defendants qualify for HCQIA's immunity from liability for damages, if the standards for professional review actions have been met.
HCQIA's immunity is triggered when the professional review action is taken:
(1) in the reasonable belief that the action was in the furtherance of quality health care;
(2) after a reasonable effort to obtain the facts of the matter;
(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and;
(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
42 U.S.C. § 11112(a). The standard for determining whether the immunity applies is one of objective reasonableness. This standard is met "if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients." Austin v. McNamara, 979 F.2d 728, 734 (9th Cir. 1992), emphasis in original; Smith, supra. Furthermore, there is a rebuttable presumption that the professional review action *303 satisfies the requirements of 42 U.S.C. § 11112(a), and the plaintiff/physician bears the burden of proving by a preponderance of the evidence that the peer review process did not satisfy the statutory requirements. See 42 U.S.C. § 11112(a); Rogers, supra.
Summary judgment disposition of the HCQIA immunity issue is appropriate. Austin, supra; Rogers, supra; Smith, supra. As an appellate court, we are directed to conduct a de novo review of the documentation supporting and opposing summary judgment under the same criteria which governs the district court's determination of whether summary judgment is appropriate. Pugh v. Beach, 31,361 (La. App.2d Cir.12/11/98), 722 So.2d 442; Berzas v. OXY USA, Inc., 29,835 (La.App.2d Cir.9/24/97), 699 So.2d 1149. A motion for summary judgment is properly granted if the pleadings, answers to interrogatories, depositions, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B); Pugh, supra. With the well-known and oft-repeated principles governing summary judgment in mind, we turn now to address whether summary judgment is appropriate in this instance.
Dr. Manasra asserts that there is a genuine issue of material fact as to the unfairness of the peer review process. Because of the presumption of fairness set forth in HCQIA, the burden is on Dr. Manasra to establish that the requirements of HCQIA were not satisfied. Dr. Manasra contends that he did not receive notice describing the behavior alleged to be disruptive. This assertion is groundless in light of the repeated efforts beginning in December 1989 to address and correct his objectionable and disruptive behavior. Dr. Manasra was fully aware of what behavior formed the basis for the suspension and subsequent revocation of his privileges as evidenced by numerous meetings held in August 1993 to address both his behavior and the resulting problems in the NICU. As shown in the facts, Dr. Manasra acknowledged on more than one occasion that his behavior, including use of obscenities, yelling, screaming, and making inappropriate comments, was disruptive and that he had a "terrible temper." Also, Dr. Manasra repeatedly agreed that he would work to correct his behavior. Dr. Manasra was informed prior to the September 15, 1993 meeting of the MEC that there had been ongoing complaints of "frequent emotional outbursts," the use of obscenities, and erratic behavioral swings resulting in an atmosphere of "fear and intimidation" in the NICU. Finally, after requesting a hearing before the peer review committee, Dr. Manasra received lists of witnesses, summaries of testimony, and copies of documents to be submitted at the hearing. It clearly cannot be said that Dr. Manasra was not aware of or given notice of the specific behavior at issue.
Dr. Manasra also claims that the peer review hearing was unfair because he received notice only two weeks prior to the hearing that his clinical competency was at issue. Although Dr. Manasra characterizes the issue of clinical competency as a new charge raised on the eve of the peer review hearing, the record shows that the issue was brought to Dr. Manasra's attention at the MEC meeting on September 28, 1993. Concerns that Dr. Manasra's refusal to communicate with certain nurses may have compromised patient care and possibly resulted in a mortality were discussed in Dr. Manasra's presence at the MEC meeting, and Dr. Manasra reported to the MEC that two infants had died over the weekend. Clearly, Dr. Manasra was aware prior to requesting the peer review hearing that the circumstances surrounding the care of these infants was at issue, particularly the manner in which his behavior impacted the quality of patient care.
Dr. Manasra also asserts that his request for a continuance of the peer review *304 hearing was denied in violation of SFMC's Rules and Regulations of the Medical Staff. These rules provide that such hearings shall be held not later than 30 days from the date of receipt of the request for a hearing. The rules further provide that postponement beyond the time set forth in the rules "shall be made only with the approval of the ad hoc hearing committee" and that postponement shall be for "good cause" and in the sole discretion of the hearing committee. Dr. Manasra contends that he requested a continuance of the hearing due to the need for additional time to evaluate the "new charges of clinical competence" and to a conflict in his attorney's trial schedule. Dr. Manasra asserts that his request was not submitted to the peer review committee, but was summarily rejected by the hearing officer.
The record shows that the hearing date had been postponed once to accommodate Dr. Manasra. The new hearing date, November 15, 1993, was selected from dates deemed available by Dr. Manasra and his counsel. As discussed above, the issue of clinical competency relating to the deaths of two infants was not a new issue. Finally, there was no direct conflict between the hearing date and the trial scheduled by Dr. Manasra's counsel. The hearing was scheduled for Saturday, December 11, 1993; Dr. Manasra's counsel had a trial set for Monday, December 13, 1993. The hearing officer discussed postponement with the Dr. Ulrich, the chairman of the committee. Dr. Ulrich opposed postponement. On the day of the hearing, the hearing officer delayed the start of the hearing to give Dr. Manasra an opportunity to appear and thoroughly explained to the committee members the events surrounding Dr. Manasra's request for postponement. No objections were voiced. Dr. Manasra was aware that a second postponement was not granted and chose not to appear. In deposition testimony, Dr. Manasra could not explain why he did not appear at the hearing. It is clear that no good cause existed for postponement of the hearing as required by SFMC's rules. Dr. Manasra was afforded adequate notice and hearing procedures as required by 42 U.S.C. § 11112(a)(3). There is no genuine issue of fact as to the fairness of the hearing procedure simply because the hearing was not postponed a second time.
Dr. Manasra also asserts unfairness in the peer review process based on the involvement of SFMC's attorney at the hearing. Dr. Manasra contends that SFMC's attorney impermissibly presented evidence, questioned witnesses, and participated in drafting the ruling. The record of the peer review hearing shows that SFMC's attorney called witnesses and asked questions at the hearing. However, nothing in either SFMC's rules or HCQIA prohibits the presence or involvement of counsel. Even with the presence of SFMC's counsel, a genuine peer review occurred. The members of the peer review committee actively participated in the hearing by thoroughly questioning the witnesses. The record of the hearing shows that the committee members, through their questions, sought to determine whether Dr. Manasra' situation was salvageable. For instance, committee members questioned whether the problems in the NICU may have resulted from other personnel, whether the problems could be resolved by allowing Dr. Manasra more control over the NICU, and whether Dr. Manasra's behavior resulted from causes which could be addressed other than by suspension or revocation of his privileges. Clearly, involvement of SFMC's counsel did not deprive Dr. Manasra of a professional peer review as required by SFMC's rules and HCQIA.
There is also no support for Dr. Manasra's contention that the peer review process was unfair because SFMC's counsel participated in drafting the ruling of the peer review committee. Dr. Ulrich, in his deposition, stated that he drafted the ruling based on notes taken during the hearing and discussions among the committee *305 members. He then sent a rough draft of the ruling to the hearing officer who prepared the final copy. Dr. Ulrich denied any involvement of SFMC's counsel or any member of SFMC's administration in drafting the ruling. Nothing in the record supports Dr. Manasra's contention.
After close consideration of the peer review hearing transcript and the numerous documents submitted in support of and in opposition to summary judgment, we find that no genuine issue of material fact exists as to whether the peer review hearing satisfied the requirements of HCQIA for purposes of triggering the immunity against Dr. Manasra's claims for damages. The pattern of behavior exhibited by Dr. Manasra since joining SFMC's staff, the intensification in 1993 of his disruptive behavior involving profanity, threats, and daily outbursts, along with the evidence of deterioration in patient care provided a sufficient basis for the peer review committee to form a reasonable belief that approval of the MEC's recommendation would further quality health care and that such action as recommended by the MEC was warranted by the facts known. The peer review committee's decision was made after a reasonable effort to obtain the facts and after affording Dr. Manasra adequate notice and hearing procedures which he chose not to take full advantage of by failing without good cause to attend the peer review hearing. As a reviewing court, our role is not to substitute our judgment for that of the hospital's governing board or to re-weigh the evidence regarding the termination of medical staff privileges. Shahawy v. Harrison, 875 F.2d 1529 (11th Cir.1989); Rogers, supra. Accordingly, summary judgment is appropriate in this instance because HCQIA immunity may be asserted by the defendants against those claims other than the discrimination claim, which we will address next.

National Origin Discrimination:
Dr. Manasra, who is Jordanian, argues that there are genuine issues of fact in dispute as to whether he was a victim of national origin discrimination. We find no merit in this argument because the record shows overwhelmingly that the basis for Dr. Manasra's termination was his ongoing behavioral problems which escalated in 1993 with adverse effects on the NICU and the quality of patient care.
Dr. Manasra did not allege national origin discrimination until over three years after filing suit. The "Fifth Amended Petition" alleging discrimination was filed in response to motions for summary judgment based on HCQIA immunity filed by the defendants. Dr. Manasra did not allege discrimination during the disciplinary and review process which resulted in the revocation of his staff privileges. However, since complaints about his behavior arose in 1989, Dr. Manasra attempted to downplay the complaints by claiming his behavior was due to cultural differences. For instance, the record shows that Dr. Manasra would refer to his upbringing whenever forced to face complaints about his behavior. At the staff meetings in August 1993 and at the MEC meeting on September 28, 1993, Dr. Manasra used his upbringing and culture in an effort to explain or excuse his behavior towards the nurses and other staff in the NICU. His own advocate at the meeting, Dr. Rahn Sherman, opined that Dr. Manasra's behavior may have resulted from cultural differences and learned behavior from his childhood. The record shows that although Dr. Manasra tried to use his national origin as an excuse for the ongoing problems, this excuse was rejected by SFMC. According to the minutes of the MEC meeting, it was noted that Dr. Manasra had been in the United States for over thirteen years. Additionally, Dr. Manasra had attended cultural counseling in 1991 after his privileges were summarily suspended.
At the peer review hearing, Dr. Cage, a member of the committee posed the following *306 thought to Mr. Smith about Dr. Manasra:
I saw something in some of these things about Dr. Nawas taking to him with the thought, maybe, of his Middle Eastern background and the way women are treated by men there, to see if that was a part of the problem, because women it sounds like he treats women like they are treated in the Arab countries, that women are less than human and they are to be used by men, and that's about the whole deal, and that's what it sounds like to me.
Dr. Manasra claims that this statement evidences discriminatory intent and that this statement was so outrageous that it "electrified" the entire proceeding. However, our review of the entire hearing transcript shows that Dr. Manasra misinterprets the effect of this statement and incorrectly attributes discriminatory purpose to the review hearing. Mr. Smith replied to Dr. Cage as follows:
I've been in hospital administration about twenty-four years, and I've worked with all kinds of physicians from all different nationalities and backgrounds. I'd say it's worse than that. I mean, I'veyes, there's some cultural things that come in there, but even in those kinds of situations where you have a cultural barrier, I've not seen language or tactics used like this. I think Gordon was mild. After we did get into this, it was completely obvious that the nurses up there were in total fear of this individual. I mean, total fear.
Mr. Smith rejected the notion of cultural differences as the cause of Dr. Manasra's behavior and informed the review panel that the behavior at issue went beyond what could be considered cultural barriers. The review panel then went on with the hearing and fully addressed Dr. Manasra's situation. Nothing in its ruling suggests that its decision to approve the recommendation of the MEC was based on Dr. Manasra's national origin.
Dr. Manasra claims that he was threatened by a former hospital administrator with imprisonment like the U.S. citizens of Japanese descent during WWII, that he was informed by the same administrator that he would be carefully watched for disruptive activity, that he was described as a "foreign doctor" during nursing staff orientations, and that NICU nurses were biased against him due to his national origin. Although Dr. Manasra asserts that these occurrences create issues of fact as to his discrimination claim, nothing in the record relates these alleged occurrences to the suspension and revocation of his staff privileges. The hospital administrator who allegedly made the remarks to Dr. Manasra was no longer employed at SFMC at the time of the 1993 review process and had no involvement in the decision to suspend and terminate Dr. Manasra's staff privileges. Even if we consider the allegation that some NICU nurses were biased against Dr. Manasra due to his national origin, such bias does not excuse the behavior exhibited by Dr. Manasra while at SFMC. Dr. Manasra did not deny the behavior complained of over the years. Instead, he attributed his behavior to misinterpretation of his over-expressed feelings, cultural differences, and his desire to provide health care to ill infants.
We fail to see any connection between Dr. Manasra's claim of discrimination and the revocation of his privileges and staff membership. The record includes an overwhelming showing of the harassing, abusive, and ugly behavior exhibited by Dr. Manasra while at SFMC. We do not believe that any cultural differences which may have existed excuse Dr. Manasra's behavior, nor can we say that SFMC would be required to endure such behavior from a staff member simply because the behavior allegedly stemmed from cultural differences. Furthermore, there is no showing in the record of how Dr. Manasra's behavior would be related to cultural differences as he claims.
*307 Considering the overwhelming showing that the suspension and revocation of Dr. Manasra's staff privileges was due to his ongoing disruptive behavior beginning in 1989 and the escalation of disruptive behavior in 1993 which began to adversely affect patient care, we find no genuine issue of fact as to whether national origin discrimination was the basis for the disciplinary action against Dr. Manasra. Summary judgment in favor of the defendants is likewise appropriate as to the claim of national origin discrimination.

CONCLUSION
For the reasons set forth above, we affirm the trial court's judgment granting the defendants' motions for summary judgment and dismissing the plaintiff's claims. Costs are assessed to the plaintiff, Dr. Manasra.
AFFIRMED.
NOTES
[1] The peer review committee members included Drs. Chris Ulrich, Doyle Hamilton, Dan Hutton, Mike Cage, and Douglas Brown.
[2] Dr. Manasra assured the federal court that he did not intend to pursue federal remedies and that he only intended to pursue claims provided under state law.